Lee GAETHKE, Plaintiff-Respondent,

v.

Marco POZDER, Ljubica Pozder
d/b/a The Crossroads Motel and Acuity,
A Mutual Insurance Company,
Defendants-Appellants.

Court of Appeals

*No. 2016AP541. Submitted on briefs November 10, 2016.
—Decided May 17, 2017.*

2017 WI App 38

(Also reported in 899 N.W.2d 381.)

453

On behalf of the defendants-appellants, the cause was submitted on the briefs of *W. Timothy Steinle* of *Terschan, Steinle, Hodan & Ganzer, LTD.*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Kent A. Tess-Mattner* and *Amy Hetzner* of *Schmidt, Rupke, Tess-Mattner & Fox, S.C.*, Brookfield.

Before Neubauer, C.J., Gundrum and Hagedorn, JJ.

¶ 1. GUNDRUM, J. Marco and Ljubica Pozder, d/b/a The Crossroads Motel and Acuity, a Mutual Insurance Company, appeal from a judgment following a jury trial. The Pozders[1] contend the circuit court erred by denying their postverdict motion to change the jury's verdict finding them negligent in relation to Lee Gaethke's slip and fall at their motel. They specifically assert there was insufficient evidence presented at trial to support the negligence finding under either Wisconsin's Safe Place statute, WIS. STAT. § 101.11(1) (2015–16),[2] or the common law. The Pozders further argue the court erred in admitting medical bills into evidence at the trial and in denying their postverdict motion for a new trial based upon "outrageous conduct" by Gaethke's counsel during the trial. We reject each of the Pozders' claims of error and affirm.

### Background

¶ 2. On February 8, 2013, Gaethke slipped and fell on ice while walking on a sidewalk at the Pozders' motel. He filed a complaint alleging that the Pozders'

---

[1] We will use "the Pozders" to occasionally refer to only Marco and Ljubica Pozder and to occasionally refer to all defendants-appellants.

[2] All references to the Wisconsin Statutes are to the 2015–16 version unless otherwise noted.

455

negligence, under Wisconsin's Safe Place statute and the common law, caused his fall and related injury. A jury trial was held, and the following relevant evidence was presented and events occurred at the trial.

¶ 3. Gaethke testified he arrived at the motel around 7:45 p.m. on February 8. After Ljubica registered him at the front desk, he retrieved a bag from his car and began walking across the parking lot toward his room. Noticing the surface to be slippery, he diverted his direction to the sidewalk. When he first walked on the sidewalk, it was not icy, but as he neared his room, he slipped and fell. In "extreme pain" and unable to walk, he crawled to his room, where he "went unconscious" after looking at his lower right leg. When he regained consciousness, Gaethke called his "life partner," Tara Agnew, and his brother, Henry Gaethke, both of whom responded to the motel, took him to Lakeland Hospital, and eventually brought him back to the motel. Gaethke subsequently went to a second hospital where surgery was performed on his leg and he spent several days recovering. A second surgery was performed at a later time.

¶ 4. Henry testified that the night of Gaethke's fall, Gaethke called him and told him he needed Henry to come to the motel. Arriving there, Henry parked his vehicle "right next to" the door to Gaethke's room and found both the parking lot and sidewalk in that area to be "very slippery," almost falling himself several times as he walked to Gaethke's room. He observed approximately four patches of ice on the sidewalk near the room. Henry confirmed for the jury that there was "ice all over the place."

¶ 5. Agnew testified that around 10:15 p.m. on the night Gaethke fell, Gaethke called her crying and in pain. She drove to the motel, arriving about an hour

456

after the call. She slipped and fell upon exiting her vehicle, and as she proceeded to Gaethke's room, she observed "ice and chunks of ice all along the sidewalk" and the parking lot to be "shiny" and "like a whole sheet of ice."

¶ 6. Meteorologist Allen Becker testified that there had been snow on the ground in late January that was "persisting under cold temperatures, creating a source of snow and ice." In the days leading up to Gaethke's fall, the temperature ranged from minus four to about twenty-six degrees until February 7, when temperatures reached "32, 33, 34" degrees and a snowstorm developed, dropping approximately five inches of snow in the area before ending at approximately 1:00 a.m. on February 8. Around that same time, the temperature began to fall, hovering between twenty-one to twenty-four degrees for most of February 8, before falling to between nineteen and fourteen degrees in the "time window" of Gaethke's fall.

¶ 7. Considering the temperature "for the entire week up to and the day after the accident," Becker testified he was able "to assess whether if there was snow on the ground, if it would melt or if it melted would it refreeze. If there was any snow or ice, would it be preserved by the cold temperatures." Becker explained that the temperature at or slightly above freezing "could cause some melting or at least snow to be a little bit wet," and added that the "most obvious explanation" for ice on the sidewalk around the time of Gaethke's fall "would be the snowstorm of the day before . . . . After the snow stops falling, the temperature cools into the 20s, so that would maintain the snow, and then that obviously could explain the presence of ice." If there was ice on the sidewalk, Becker

testified, it could have "come from days before" or "formed from the effects of the snowfall" from the day prior to Gaethke's fall.

¶ 8. John Prijic, superintendent of streets for the City of Kenosha, testified he had been removing snow and ice from streets and sidewalks for thirty-two years and that ice and snow at The Crossroads Motel "could have been removed and made safe" in a timely, simple, and inexpensive fashion on February 8, 2013, by "shovel, snow blow, or plow." "[T]hen if there's any residual snow or ice, you can remove that or treat that with chemicals," which can be obtained from "any hardware store." Once deicing material is applied, it takes anywhere from ten minutes to an hour to make an icy surface no longer slippery and dangerous. Prijic testified that sand can also be used to "provide immediate traction."

¶ 9. During the trial, the Pozders objected—on grounds of hearsay and lack of proper authentication—to the introduction of medical bills and a summary of those bills. The only medical testimony presented to the jury came from the deposition of Dr. William Yoder. During that testimony, Yoder, when shown the summary of the bills (but not the bills themselves), indicated he was not "qualified to give an opinion" as to the "actual amounts that are typically charged" for the services. The circuit court overruled the Pozders' objection and admitted the documents, Exhibit 6, finding they were sufficiently authenticated by other evidence and were admissible under Wis. Stat. § 908.03(24), the "residual hearsay" exception.

¶ 10. The Pozders did not attend the trial. Their testimony was videotaped a month earlier and played for the jury at trial. In her testimony, Ljubica stated she and Marco would not be at the trial because they

458

would be in Australia for three months visiting family. During his initial closing argument, Gaethke's counsel stated the Pozders "couldn't wait a month to come here to court to tell you how this accident happened." The Pozders' counsel objected. A brief discussion ensued between counsel for both parties and the court, which discussion was interrupted by the wife of Gaethke's counsel, who herself is not an attorney. Later, during rebuttal argument, Gaethke's counsel made a reference to the race of one of Gaethke's witnesses and the manner in which the Pozders' counsel cross-examined her.

¶ 11. The jury found the Pozders sixty-five percent negligent and Gaethke thirty-five percent negligent in relation to Gaethke's fall. The Pozders filed a postverdict motion raising the same issues as in this appeal. The circuit court denied the motion, and the Pozders appeal.

## *Discussion*

¶ 12. The Pozders contend the circuit court erred by denying their postverdict motion to change the jury's verdict finding them negligent. They assert the evidence was insufficient to support the finding under either Wisconsin's Safe Place statute, WIS. STAT. § 101.11(1), or the common law. They further argue the court erred in admitting the medical bills, Exhibit 6, into evidence and in denying their postverdict motion for a new trial based upon "outrageous conduct" by Gaethke's counsel. We disagree with each point.

*Request to Change Jury's Answer on Verdict*

¶ 13. The first question on the special verdict asked the jury if the Podzers were "negligent with respect to maintaining the sidewalk" at the motel on

the date Gaethke fell. The jury answered this question "Yes." The circuit court denied the Pozders' postverdict motion to change the answer to "No."

¶ 14. In reviewing a circuit court's denial of a motion to change the jury's answer to a verdict question:

> [W]e view the evidence in the light most favorable to the verdict and affirm the verdict if it is supported by any credible evidence. We search the record for credible evidence that sustains the verdict, and if the evidence gives rise to more than one reasonable inference, we accept the inference the jury reached.

*Kubichek v. Kotecki*, 2011 WI App 32, ¶ 14, 332 Wis. 2d 522, 796 N.W.2d 858 (citations omitted); *see also* WIS. STAT. § 805.14(1). The standard of review is even more "stringent" where, as in the case now before us, "the circuit court upheld the jury's findings on motions after verdict. In such cases, we will not overturn the jury's verdict unless 'there is such a complete failure of proof that the verdict must be based on speculation.' " *Kubichek*, 332 Wis. 2d 522, ¶ 14 (citations omitted).

¶ 15. The Pozders contend the evidence is insufficient to sustain the jury's "Yes" answer under either a safe place statute or common law theory of negligence. As to the safe place statute, they argue the evidence did not show they had notice of the unsafe condition prior to Gaethke's fall as required for liability under the statute. As to common law negligence, they conclusorily assert they "exercised ordinary care under the circumstances."

¶ 16. An owner is liable under the safe place law for an unsafe condition associated with a premises if he/she has "actual or constructive notice" of the dangerous condition. *See Rosario v. Acuity & Oliver Adjustment Co.*, 2007 WI App 194, ¶ 12, 304 Wis. 2d 713, 738 N.W.2d 608. Generally, an "owner is deemed to have constructive notice of a defect or unsafe condition when that defect or condition has existed a long enough time for a reasonably vigilant owner to discover and repair it." *Megal v. Green Bay Area Visitor & Convention Bureau, Inc.*, 2004 WI 98, ¶ 12, 274 Wis. 2d 162, 682 N.W.2d 857. "The length of time viewed as sufficient varies according to the nature of the business, the nature of the defect, and the public policy involved." *Rosario*, 304 Wis. 2d 713, ¶ 12 (quoting *May v. Skelley Oil Co.*, 83 Wis. 2d 30, 36–37, 264 N.W.2d 574 (1978)). "Whether an . . . owner has notice of an unsafe condition generally is a question of fact left to the jury." *Megal*, 274 Wis. 2d 162, ¶ 20 n.2. Unlike common law negligence, the safe place statute "addresses unsafe conditions, not negligent acts," and imposes upon the owner "a higher standard of care than that imposed by common-law negligence." *Id.*, ¶ 9 (citation omitted).

¶ 17. Relying heavily upon our supreme court's decision in *Merriman v. Cash-Way, Inc.*, 35 Wis. 2d 112, 150 N.W.2d 472 (1967), the Pozders contend they had neither actual nor constructive notice of the icy sidewalk and any finding to the contrary "would be based on conjecture and speculation." They assert "there is absolutely no evidence as to how long the hazard had existed." We see things differently.

¶ 18. The plaintiff in *Merriman* slipped and fell on ice in a store parking lot. *Id.* at 114. A jury found the

461

defendant store owner negligent, based upon the safe place statute, for failing to apply sand or salt to maintain the area in a safe condition. *Id*. at 114–15. On a postverdict motion, the circuit court set aside the jury's finding of negligence, concluding there was no credible evidence the store owner "knew or should have known of the dangerous condition of the area where the plaintiff fell." *Id*. at 115. On appeal, our supreme court agreed the evidence was "insufficient to impose constructive notice," stating:

> [T]here is no evidence as to how long the ice condition had existed prior to the plaintiff's fall. There is no evidence as to the extent of the ice patch on the day of the accident or as to whether there were additional patches of ice in the parking lot. There is no evidence of weather conditions which would have precipitated the formation of this ice patch. Without evidence as to how long the hazard had existed, so as to warrant the assumption that a vigilant owner would reasonably have discovered it and repaired it, the defendant cannot be held to have had constructive notice of the defect.

*Id*. at 116–17.

■

¶ 19. The case now before us differs dramatically. Here, Gaethke testified that just moments before he fell, he observed the parking lot to be slippery, so he diverted to the sidewalk where he eventually slipped and fell. Henry and Agnew provided additional evidence as to the extent of ice on the parking lot and sidewalk, including that they both slipped on ice after arriving to assist Gaethke. Henry testified there was "ice all over the place," and Agnew testified the parking lot looked "like a whole sheet of ice" and she observed "ice and chunks of ice all along the sidewalk."

¶ 20. Most significantly, unlike in *Merriman*, in this case the jury heard evidence from which it could reasonably infer the icy conditions had existed for a sufficient amount of time prior to Gaethke's fall "to warrant the assumption that a vigilant owner would reasonably have discovered" and addressed the icy conditions by the time they contributed to the fall. *See id.* at 116. Meteorologist Becker testified to the weather conditions in the area[3] in the days and hours leading up to Gaethke's fall "which would have precipitated the formation of this ice patch," even identifying the last time period during which the ice Gaethke slipped on reasonably could have formed. The "most obvious explanation" for the ice on the sidewalk, Becker explained, "would be the snowstorm of the day before." Temperatures were a "degree or two above freezing" during the storm, which ended approximately eighteen hours prior to Gaethke's fall. Then, temperatures dropped to and remained between twenty-one to twenty-four degrees for most of time leading up to Gaethke's fall, cooling to between nineteen and fourteen degrees in the "time window" of the fall. If the ice

---

[3] The Pozders argue "[i]t is important to emphasize that the weather data [Becker] obtained was from sources located anywhere from 12 miles to 27 miles away" from the motel. However, Becker testified that in reaching his conclusions he reviewed ten weather stations within about a thirty-mile radius of the motel; and considering the temperature, snowfall, and precipitation data, he found "a high degree of consistency" among the stations. He further indicated the four stations surrounding the motel "were all within one or two degrees of each other." From this testimony, the jury could reasonably conclude the weather conditions at the motel in the days and hours leading up to Gaethke's fall were consistent with the conditions to which Becker testified.

did not form during this time period, Becker added, it formed days earlier. Additionally, street superintendent Prijic testified the ice and snow at the motel could have been "removed and made safe" in a timely and inexpensive manner prior to Gaethke's fall by employing "shovel, snow blow, or plow," and applying salt and/or sand. Thus, unlike in *Merriman,* the evidence presented to the jury in this case was more than sufficient to support a finding that the Pozders had constructive notice of the icy conditions on the parking lot and sidewalk.

¶ 21. Because the evidence was sufficient to support the verdict under a safe place theory of negligence, we need not address the Pozders' additional assertion that the evidence was insufficient to support the verdict under a common law theory. Furthermore, we also do not address this assertion because they have failed to sufficiently develop an argument in support of it. *See Clean Wis., Inc. v. PSC,* 2005 WI 93, ¶ 180 n.40, 282 Wis. 2d 250, 700 N.W.2d 768 ("We will not address undeveloped arguments."). We conclude the circuit court did not err in rejecting the Pozders' request to change from "Yes" to "No" the jury's answer to the first question on the special verdict.

*Medical Bills*

¶ 22. Over the Pozders' objection, the circuit court admitted medical bills, Exhibit 6, into evidence at trial. The Pozders argue the court erred in doing so because the bills were not properly authenticated pursuant to Wis. Stat. § 908.03(6m)(b) and were inadmissible hearsay. They further insist that because the requirements of § 908.03(6m)(b) were not met, a point Gaethke does not dispute, key presumptions from § 908.03(6m)(bm) do not apply and because they do not

apply, testimony from medical personnel was necessary—but not presented—in order to authenticate the bills and prove they stated the reasonable value of the services provided to Gaethke and that the services were reasonable and necessary to his care. Without admission of the bills, the Pozders state, "the jury would have had no way to determine that Mr. Gaethke was to be awarded $67,303.23." We conclude the medical bills were properly authenticated, properly admitted pursuant to the residual hearsay exception, § 908.03(24), and entitled to the presumptions of § 908.03(6m)(bm).

¶ 23. An appellate court "review[s] a circuit court's decision to admit or exclude evidence under an erroneous exercise of discretion standard. In making evidentiary rulings, the circuit court has broad discretion." *Martindale v. Ripp*, 2001 WI 113, ¶ 28, 246 Wis. 2d 67, 629 N.W.2d 698 (citations omitted); *see also Christensen v. Economy Fire & Cas. Co.*, 77 Wis. 2d 50, 55, 252 N.W.2d 81 (1977) ("[T]he decision on the admissibility of a hearsay statement is within the discretion of the trial court."). "Our inquiry into whether a circuit court properly exercised its discretion in making an evidentiary ruling is highly deferential." *Martindale*, 246 Wis. 2d 67, ¶ 29.

¶ 24. WISCONSIN STAT. § 908.03(6m) provides in relevant part:

> (a) *Definition.* In this subsection:
>
> . . . .
>
> 2. "Patient health care records" has the meaning given in [WIS. STAT. §] 146.81(4).
>
> (b) *Authentication witness unnecessary.* A custodian or other qualified witness required by

sub. (6) is unnecessary if the party who intends to offer patient health care records into evidence at trial . . . does one of the following at least 40 days before the trial . . .:

> 1. Serves upon all . . . parties [a] . . . duplicate of the patient health care records . . . certified by the record custodian.
>
> 2. Notifies all . . . parties that [a] . . . duplicate of the patient health care records . . .certified by the record custodian is available for inspection and copying . . . .
>
> (bm) *Presumption.* Billing statements or invoices that are patient health care records are presumed to state the reasonable value of the health care services provided and the health care services provided are presumed to be reasonable and necessary to the care of the patient . . . .

¶ 25. The Pozders concede the bills in Exhibit 6 satisfy the meaning of "patient health care records" in WIS. STAT. § 908.03(6m). They argue, however, that the bills were inadmissible because Gaethke did not satisfy the requirements of § 908.03(6m)(b); specifically, the records were not "certified" and Gaethke failed to serve the Pozders with a duplicate copy of them or notify the Pozders that they were available for inspection and copying.

¶ 26. In rejecting the Pozders' trial objection to the admissibility of the medical bills, the circuit court concluded as to their authenticity that Gaethke himself could testify regarding whether the bills related to his injury. The court further pointed out that the bills all had "some sort of identifying characteristic" that supported a finding that they were what Gaethke

466

claimed they were—bills for medical expenses he incurred as a result of his fall at the motel. Specifically, the court noted that "each [bill] has a health care provider at the top. They all have Mr. Gaethke's name on them. And they all give a date and talk about issues of the ankle. They are different providers all, the Foot Clinics of Wisconsin, or Family Foot Clinics, United Hospital, St. Catherine's."

¶ 27. WISCONSIN STAT. § 909.01 provides: "The requirements of authentication or identification as a condition precedent to admissibility are satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Examples of "authentication or identification conforming with the requirements of [§] 909.01," include "[t]estimony of a witness with knowledge that a matter is what it is claimed to be" and "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." WIS. STAT. § 909.015(1), (4).

¶ 28. Significantly, Gaethke himself provided "[t]estimony of a witness with knowledge that a matter is what it is claimed to be," by testifying that he had had the opportunity to study Exhibit 6 and, other than the top summary page, all of the pages in Exhibit 6 were bills for medical treatment he received in relation to the injury he incurred to his ankle during his fall at the motel on February 8, 2013. The Pozders did not challenge this testimony; indeed their counsel conceded at trial that the bills "appear to be from the health care providers that I'm aware of . . . . [T]hey do appear to be for care and treatment as a result of the injuries sustained, at least based upon my review of just the bills." Also significant, "distinctive characteristics" of the bills, like their "[a]ppearance, contents,

[and] substance . . . taken in conjunction with circumstances" support the conclusion that the bills were what Gaethke claimed they were. *See* Wis. Stat. § 909.015(4). The bills itemize medical services and products provided by various medical entities or personnel over a two-year period beginning on February 9, 2013, and identify that those services or products were provided to Gaethke in relation to his lower leg. Furthermore, testimony of various witnesses which correspond to and corroborate dates or specific items on the bills further confirm their authenticity.[4] We

---

[4] Multiple witnesses, including Gaethke, testified Gaethke first received medical care on February 9, 2013, at Lakeland Hospital for the injury he sustained to his lower leg the night of February 8, 2013. Correspondingly, the first bill in Exhibit 6 is from "Aurora *Lakeland* Medical Center," and shows itemized charges for various products and services provided on February 9, 2013, including "Tibia and Fibula 2 View Rt" and "Apply Splint Long Leg." (Emphasis added.) Gaethke also testified that at Lakeland "[t]hey drugged me up and sent me home," which testimony appears consistent with charges on the bill for "Drug/Self Admin Ondansetrom ODT 4 M," "Hydromorphone Inj 1 Mg/Ml 1 Ml," and "Hydrocodone/APAP 5–325 MG Tab." Another bill in Exhibit 6 identifies services provided at "Aurora *Lakeland* Med" on February 9, 2013, and includes charges for "XRAY: Lower Leg" and "XRAY: Knee."

Gaethke testified he subsequently went to a second hospital, "St. Catherine's" in "Kenosha," where he was treated for several days. Dr. William Yoder testified "St. *Catherine's* Medical Center" in Kenosha, Kenosha Hospital, and Kenosha Medical Center, comprise "United Hospital System." (Emphasis added.) Exhibit 6 contains numerous pages of bills with itemized charges from "United Hospital System" as well as bills for services provided by various named physicians at "UHS-St. *Catherine's* Campus" from February 10 through 14, 2013. (Emphasis added.) Gaethke testified he had surgery at this second hospital, and one of the UHS bills includes February 12, 2013 charges for, inter alia, "OR ROOM," "RECOV ROOM" and "Anesthesia" supplies, as well as February 13 and

468

conclude the evidence was sufficient to support the circuit court's finding that the bills were what Gaethke claimed and thus were authentic.

¶ 29. The Pozders also maintain the bills are inadmissible hearsay and the circuit court erred in

14 charges for "Gait Training." In his testimony, Yoder stated Dr. Stephenson performed the first surgery on Gaethke's leg, and a three-page bill in Exhibit 6 from "Family Foot Clinics of WI SC" shows a February 12, 2013 charge for provider "Stephenson" for "Treat Lower Leg Fracture."

Gaethke testified "Dr. Stephenson" performed a second surgery on him, and Yoder testified that during the second surgery, "some of the hardware" that had been implanted during the first surgery was removed. Exhibit 6 includes a June 28, 2013 UHS bill that includes itemized charges for "OR Room," "Hardware Removal," "Recov Room," and "Anesthesia" supplies, and the Family Foot Clinics bill shows a charge for provider "Stephenson" related to "Removal of Support Implant" and "Flouroscope Examination" on June 28, 2013.

Gaethke testified to also being treated by Yoder, which treatment included Yoder giving him "a cortisone shot" in his ankle for pain. A bill in Exhibit 6 from "Family Foot & Ankle Clinics of Wisconsin LLC" contains a charge for "Ultrasound Guided Cortisone" performed by "Yoder, William" on October 10, 2013. In his testimony, Yoder described how after a surgery inserting metal and screws, such as Gaethke's surgery, a cast is put on. The Family Foot Clinics bill includes charges on March 28 and April 25, 2013, related to Stephenson for "Removal/ Revision of Cast," as well as "X-Ray Exam of Ankle." Yoder described how after a cast has been worn, "progressive weight bearing" is begun by putting a "boot" on the patient. The Family Foot Clinics bill shows an April 25, 2013 charge related to Stephenson for "Walk Boot Non-Pneumatc Prefab." Yoder testified that Gaethke visited him for care on five different occasions, and the billing records from Family Foot & Ankle Clinics indicate Yoder provided services to Gaethke on five separate dates between August 29, 2013, and March 9, 2015, with this latter date being a date to which Yoder specifically testified treating Gaethke.

admitting them into evidence pursuant to the residual hearsay exception, WIS. STAT. § 908.03(24). That provision states that a statement is not excluded by the hearsay rule if it is: "A statement not specifically covered by any of the foregoing [twenty-three] exceptions but having comparable circumstantial guarantees of trustworthiness." *Id.* The Pozders assert subsec. (24) is "not applicable" in this case because it includes the language "not specifically covered by any of the foregoing exceptions" and

> there is a specific sub-section [§ 908.03(6m)] dealing with the admissibility of patient health care records that was not complied with. [Section 908.03(24)] says the Court is allowed to invoke [subsec.] (24) only if the statement was not specifically covered by any of the foregoing exceptions to the hearsay rule.

¶ 30. We reject the Pozders' three-sentence "argument" on this point because they fail to sufficiently develop it and fail to cite to any case law supporting their position. *See Clean Wis., Inc.*, 282 Wis. 2d 250, ¶ 180 n.40; *see also W.H. Pugh Coal Co. v. State*, 157 Wis. 2d 620, 634, 460 N.W.2d 787 (Ct. App. 1990) (we do not consider arguments unsupported by legal authority). Moreover, the Pozders' contention is contrary to *Mitchell v. State*, 84 Wis. 2d 325, 332–33, 267 N.W.2d 349 (1978), and *State v. Anderson*, 2005 WI 54, ¶¶ 58–63, 280 Wis. 2d 104, 695 N.W.2d 731. In those cases, our supreme court rejected arguments identical to the Pozders' that admitting hearsay statements (here, the bills) under the residual hearsay exception is impermissible where the statements are of a type normally covered by a specific hearsay exception but fail to satisfy the statutory requirements for the specific exception. *See Mitchell*, 84 Wis. 2d at 330–32

(business records); *Anderson*, 280 Wis. 2d 104, ¶¶ 54–59 (excited utterance and statement of recent perception). In each case, the court held that the hearsay statements may be admitted under Wis. Stat. § 908.03(24). *See Mitchell*, 84 Wis. 2d at 330–32; *Anderson*, 280 Wis. 2d 104, ¶¶ 54–59. Consistent with these cases, we reject the Pozders' contention that the circuit court erred in admitting the bills under subsec. (24) simply because they were patient health care records that did not satisfy the requirements of § 908.03(6m). And for the same reasons we have already concluded the circuit court did not err in finding the bills to be authentic, *see supra* ¶ 28, we also conclude the court did not err in determining the bills met the "circumstantial guarantees of trustworthiness" requirement of subsec. (24) and were properly admitted under that hearsay exception.

██

¶ 31. Lastly, the Pozders assert that the presumption of Wis. Stat. § 908.03(6m)(bm)—that "[b]illing statements or invoices that are patient health care records are presumed to state the reasonable value of the health care services provided and the health care services provided are presumed to be reasonable and necessary to the care of the patient"—does not apply in this case because the requirements of § 908.03(6m)(b) were not satisfied. We also reject this "argument" because it is conclusory and undeveloped. *See M.C.I., Inc. v. Elbin*, 146 Wis. 2d 239, 244–45, 430 N.W.2d 366 (Ct. App. 1988) (We need not consider arguments which are "unexplained and undeveloped.").

██

¶ 32. That said, we further note that the Pozders identify no language in Wis. Stat. § 908.03(6m)—and we can find none—indicating the presumption of

§ 908.03(6m)(bm) only applies if the requirements of subsec. (b) are satisfied. To the contrary, we have previously stated, "after the passage of [§] 908.03(6m)(bm), 'a party desiring to prove the reasonableness of a medical expense need no longer have a qualified expert so testify,' as long as bills reflecting past medical expenses are: (1) received into evidence; and (2) patient health care records." *J.K. v. Peters*, 2011 WI App 149, ¶ 44, 337 Wis. 2d 504, 808 N.W.2d 141 (quoting *Correa v. Farmers Ins. Exch.*, 2010 WI App 171, ¶ 4, 330 Wis. 2d 682, 794 N.W.2d 259)). Thus, we see no reason why the presumptions of subsec. (bm) would not apply in this case, where the bills are "patient health care records," as the Pozders concede, and were properly received into evidence, even if the party introducing the bills did not satisfy the requirements of subsec. (b).

## *"Outrageous Conduct" by Gaethke's Trial Counsel*

¶ 33. The Pozders also contend the circuit court erred in not granting their motion for a new trial on the basis that Gaethke's counsel engaged in "outrageous conduct" during closing arguments. We affirm on multiple grounds.

¶ 34. "We review a circuit court's decision to deny a motion for a new trial under an erroneous exercise of discretion standard." *Seifert v. Balink*, 2017 WI 2, ¶ 139, 372 Wis. 2d 525, 888 N.W.2d 816. An appellate court "usually defers to the trial court's decision because of the trial court's opportunity to observe the trial and evaluate the evidence, and the order is highly discretionary." *Krolikowski v. Chicago & N.W. Trans. Co.*, 89 Wis. 2d 573, 581, 278 N.W.2d 865 (1979) (quoting *Bartell v. Luedtke*, 52 Wis. 2d 372, 377, 190 N.W.2d 145 (1971)).

¶ 35. The circuit court held a hearing on the Pozders' postverdict motion on January 28, 2016. In its February 3, 2016 "Order for Judgment," the court stated that at that January 28 hearing it set forth "on the record in open court" the reasons for its denial of the Pozders' postverdict motion. We are not, however, privy to the court's reasons because the Pozders failed to ensure the transcript of this key hearing was included in the record.

¶ 36. "It is the appellant's responsibility to ensure completion of the appellate record and 'when an appellate record is incomplete in connection with an issue raised by the appellant, we must assume that the missing material supports the trial court's ruling.' " *State v. McAttee*, 2001 WI App 262, ¶ 5 n.1, 248 Wis. 2d 865, 637 N.W.2d 774 (citation omitted). Furthermore, on appeal "it is the burden of the appellant to demonstrate that the [circuit] court erred." *Seltrecht v. Bremer*, 214 Wis. 2d 110, 125, 571 N.W.2d 686 (Ct. App. 1997). Here, the Pozders cannot meet this burden because the circuit court's February 3 order does not include the court's reasoning for denying the postverdict motion but instead refers back to the reasoning it articulated on the record at the January 28 hearing. Simply put, the Pozders are unable to demonstrate the circuit court erroneously exercised its discretion where the court's reasons for exercising its discretion as it did are not included in the record. *See State v. Grant*, Nos. 2013AP1829, 2013AP1830 unpublished slip op. ¶ 6 (WI App Sept. 4, 2014), where we said:

> Grant has failed to ensure that the record contains a transcript of the circuit court's oral ruling at the hearing on Grant's postconviction motions. Because

473

the circuit court's written order refers back to the circuit court's oral reasoning at that hearing, Grant's failure to include the transcript makes it impossible for this court to review the circuit court's reasons for denying Grant's motions. The absence of this transcript is a second, independent basis on which this court rejects Grant's arguments.

*See also Jocius v. Jocius*, 218 Wis. 2d 103, 119, 580 N.W.2d 708 (Ct. App. 1998) (declining to address whether the circuit court erred in denying appellant physical placement rights "because in order to determine whether the trial court erroneously exercised its discretion with respect to this issue, we must be able to examine a full transcript of the proceedings. [Appellant], however, has failed to provide us with the transcript").

¶ 37. Additionally, the Pozders forfeited their opportunity to seek a new trial by not moving for a mistrial prior to the jury returning its verdict. *Seifert*, 372 Wis. 2d 525, ¶ 138 ("Generally, an offended party must object and then move for a mistrial to preserve a challenge to prejudicial remarks."); *see also Shawver v. Roberts Corp.*, 90 Wis. 2d 672, 689–90, 280 N.W.2d 226 (1979) (stating that while defense counsel erred in "inform[ing] the jury of the effect of its verdict," plaintiff's counsel failed to move for a mistrial "before the jury verdict as required by *Chart v. General Motors Corp.*, 80 Wis. 2d 91, 108, 258 N.W.2d 680 (1977)"). "The rationale for requiring a timely motion for a mistrial is to prevent counsel from gambling on a favorable jury verdict before seeking a new trial." *Shawver*, 90 Wis. 2d at 689–90 (citing *Chart*, 80 Wis. 2d at 108). Importantly, when a party timely objects and moves for a mistrial, the court has the

opportunity to consider the nature of the alleged error and arguments related to it and take appropriate corrective action, if any is needed, before the jury reaches a verdict. By failing to move for a mistrial, the Pozders did not afford the circuit court this opportunity.

¶ 38. For the forestated reasons, we reject the Pozders' appeal related to the allegedly "outrageous" conduct of Gaethke's counsel. That said, the Pozders' new trial request fails on the merits as well.

¶ 39. The Pozders make three complaints regarding the conduct of Gaethke's trial counsel during closing arguments. Their first and second complaints relate to the fact the Pozders were personally absent during the trial, testifying by videotaped deposition taken a month before trial. First, referring to testimony by Ljubica in which she stated she and Marco would not be present for the trial because they would be in Australia for three months visiting family, Gaethke's counsel stated that the Pozders "couldn't wait a month to come here to court to tell you how this accident happened." Second, the transcript indicates that as the circuit court was sustaining an objection by the Pozders' counsel to this comment, the wife of Gaethke's counsel "interrupt[ed]." The transcript does not identify anything regarding the nature of the interruption, it merely says "Interruption by Mrs. O'Connor." After the interruption and discussion related to the objection, the court stated: "You don't know the reasons why. We don't know. You aren't going to speculate beyond what—," at which point Gaethke's counsel apologized and stated, "I won't go there."

¶ 40. Lastly, the Pozders complain that in the midst of his closing rebuttal argument, Gaethke's

counsel made a reference to the race of one of Gaeth-ke's witnesses and the manner in which the Pozders' counsel cross-examined her:

> Now, each person saw it differently and each person told it differently, but our client went out and took photographs that are corroborative evidence.[5] She said I took these photographs. It shows it. You can look at these photographs. No one is saying these are staged. No one is saying they weren't taken when they said they were taken. No one is saying they're not on her phone, that these are the photographs that were taken on her phone and if she's a liar and a cheat and she's some horrible person, she happens to be *African American,* then okay, prove these photos weren't taken when they were on her phone when she said they were taken, because I believe that the way that phones work is that you can't do that. You can determine what order they were taken and when they were taken.

> And basically over and over again he said basically, ladies and gentlemen of the jury, you have to believe what my clients had to say because their story never changed, and I suggested that their story never changed because one, they wouldn't make concessions, and two, because their story was manufactured, and their story is inconsistent with the science and inconsistent with the evidence, and that the science and the evidence will show that they had plenty of time, and that there is no way in the world if what they're telling you is true that these photographs could have been taken. It's absolutely not true as to you've got to say that I don't believe my eyes. (Emphasis added.)

---

[5] Here, Gaethke's counsel appears to be referring to Tara Agnew. Both she and Gaethke testified that they live together and have two children, and the testimony at trial was that Agnew took photos of the motel property following Gaethke's fall.

¶ 41. "An order for a new trial based on improper statements of counsel is appropriate if it 'affirmatively appear[s] that the remarks prejudiced the complaining party.' " *Seifert*, 372 Wis. 2d 525, ¶ 139 (quoting *Wausau Underwriters Ins. Co. v. Dane Cty.*, 142 Wis. 2d 315, 329–30, 417 N.W.2d 914 (Ct. App. 1987)). "This standard is satisfied when the circuit court is convinced that 'the verdict reflects a result which in all probability would have been more favorable to the complaining party but for the improper argument.' " *Id.* at 139 (citation omitted).

¶ 42. As to the statement by Gaethke's counsel that the Pozders "couldn't wait a month to come here to court to tell you how this accident happened," which brief statement was made in the midst of his thirty-two page initial closing argument, the jury heard the circuit court admonish Gaethke's counsel for this comment. Furthermore, the jury heard the taped testimony of Marco and Ljubica, which presented their "side" of the case, explained why they would not be able to attend the trial, and showed they were subjected to cross-examination by Gaethke's counsel. The Pozders have failed to convince us this comment by Gaethke's counsel was of any consequence.

¶ 43. As to the interruption by the wife of Gaethke's counsel during the circuit court's ruling on the "couldn't wait a month" statement, the transcript does not identify anything regarding the nature of the interruption. As a result, we have no basis for concluding this interruption had any prejudicial impact on the Pozders' case.

¶ 44. And while the reference by Gaethke's counsel to the race of the witness and the manner in which the Pozders' counsel cross-examined her was, as

Gaethke admits on appeal, "unnecessary" and "unwarranted," the Pozders develop no argument to convince us they were prejudiced by the remarks. *See Associates Fin. Servs. Co. of Wis., Inc. v. Brown*, 2002 WI App 300, ¶ 4 n.3, 258 Wis. 2d 915, 656 N.W.2d 56 (generally, this court does not consider conclusory assertions and undeveloped arguments). Were we to order a new trial, it would be based completely on speculation as to what effect the comments may have had on the jury, and speculation alone will not support an order for a new trial. *See Moldenhauer v. Faschingbauer*, 25 Wis. 2d 475, 481, 131 N.W.2d 290 (1964).

*By the Court.*—Judgment affirmed.