**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**September 18, 2019**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP2251-CR**

Cir. Ct. No. **2017CM1175**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

TYLER J. YOST,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Waukesha County: MICHAEL P. MAXWELL, Judge. *Affirmed*.

¶1 GUNDRUM, J.[1] Tyler Yost appeals from a judgment of conviction and an order denying his postconviction motion. Yost argues the circuit court

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(f) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

erred in precluding him from presenting at trial certain testimony from a witness on the ground that the testimony was inadmissible hearsay. We agree the court erred in concluding that the challenged testimony was hearsay, but because the error was harmless, we affirm.

***Background***

¶2 Yost was charged with and on trial for disorderly conduct. At the trial, Jacob Rode testified that on March 13, 2017, while he and Yost were inmates of the Waukesha County Jail, they were sitting at a table in a common area talking about their respective probation agents. During the conversation, Yost expressed that his agent was a "bitch," and he became "agitated or irritated or angry talking about it" and "went about saying when he gets out he is going to make sure [his probation agent] pays. He's going to crimp her brake lines and he didn't care if there's anybody in the car, family members or kids." Yost further stated that he knew how to "crimp her brake lines … where no one would know it was him. He said he was going to videotape her coming to and from the office so he could figure out what car was hers." Later that night, Rode approached Yost to inquire if he had just been joking regarding his threats. In response, Yost, while sporting "a creepy smile," "was like, no, I'm serious ... dead serious."

¶3 Rode further testified that there were other inmates nearby during the initial common-area conversation, and they were almost all "call[ing] their agents [derogatory] name[s]." He added that "the tables are close together so I mean if I'm talking at one table, people three tables down can hear me.… You can easily hear people." An inmate named "Nick" was also sitting at the table with Rode and Yost during the common-area conversation.

¶4     On cross-examination, Rode agreed that he had previously told a deputy that there were several other inmates who heard the common-area conversation about the brake lines, and he testified that he had told two probation agents that

> after the conversation happened … later that night I asked Nick what to do because I knew he was going to be in there for awhile. I asked him what he would do. He knew [Yost] better than I did so he would know if he was joking or not. He said if it aggravated me that much I should say something so I did.

¶5     Yost's probation agent at the time of the alleged common-area conversation also testified. She testified that when she learned of Yost's brake-lines threat, she took it seriously. She did so because during her probation visits to Yost's home, she observed that the garage had been set up "to basically strip cars down and fix them up," Yost was usually "working on his vehicle," and he informed her that "he enjoyed fixing cars up for different shows and events that he would take these cars to"; thus, she was concerned "that he would know how to crimp a brake line." The State rested after the agent's testimony.

¶6     Yost signaled his intent to call Philip Holland, "Nick," as his first witness. The State objected, arguing that Holland could not testify to the substance of what was said during the common-area conversation because it would be inadmissible hearsay. The circuit court initially indicated, "With regard to the fact that Mr. Holland is sitting at the table hearing this conversation, I don't see how that's not admissible to him testifying as to what he heard." After further argument, the court stated: "With regard to Mr. Holland's testimony, the court is going to allow him to testify. I think it is a valid basis of impeachment if he's going to testify," but cautioned that "the testimony has to stay within the parameters of the conversation at the table." After the State inquired further, the

court sought an offer of proof, and Holland took the stand, outside the presence of the jury.

¶7    Holland testified that he was "sure" he would have heard "99 percent" of conversations around a table with a group of inmates in the common area, but that he did not recall any conversation in which Yost expressed anger toward his probation agent. Contrary to Rode's testimony, Holland further testified that Rode never spoke with him (Holland/"Nick") about whether Rode should report threatening statements made by Yost. When asked: "Do you remember testifying [in an earlier revocation hearing related to Yost] that both Mr. Yost and Mr. Rode both said negative things about their agent," Holland responded: "I would say that, yes. I did hear negative things said, but I never heard anything threatening." Holland's trial testimony continued:

> [Yost counsel:] When you say threatening, did you ever hear Mr. Yost in a conversation between the three of you or possibly other individuals where he threatened to crimp the brake line of his agent's car?
>
> [Holland:] No. The only thing I ever heard was basically disappointment as far as being treated unfairly by the [probation officer].
>
> [Yost counsel:] That was Mr. Yost being treated unfairly? Are you referring to Mr. Yost?
>
> [Holland:] I'm referring to both.
>
> [Yost counsel:] So Mr. Yost specifically expressed that he was treated unfairly? That's what he expressed in these conversations, is that what you're telling me?
>
> [Holland:] Yes.
>
> [Yost Counsel:] Do you recall if you ever heard Mr. Yost call his agent a bitch or anything to that effect?
>
> [Holland:] I never heard anything like that, no.

¶8 Changing its earlier position, the circuit court ruled that Holland could not testify that he never heard Yost threaten to crimp his agent's brake lines. The court did so on the ground that such testimony was inadmissible hearsay. The court also added that it found Holland's proffered testimony to be "unreliable … because of the vagueness of his recollection." The court did allow, however, for Yost's counsel to elicit from Holland, in front of the jury, testimony that Rode never came to him for advice on or around March 13 as to whether he should report a threat made by Yost as to his probation agent or ever spoke with him privately at all. On this, Holland testified before the jury as follows:

> [Yost counsel:] … Do you remember whether Mr. Rode ever came to you in the jail on or about March 13th and requested or asked you if he should report threats made by Mr. Yost to his agent?
>
> [Holland:] No.
>
> [Yost counsel:] Do you recall him ever coming to you to talk about Mr. Yost at all in a private fashion?
>
> [Holland:] No.
>
> [Yost counsel:] … Mr. Rode never pulled you aside or whispered over while you're sitting on a table on the 13th of March and asked you whether he should report the conversation that Mr. Yost had earlier threatening his agent?
>
> [Holland:] No.

On cross-examination, the State elicited acknowledgments from Holland that he was "friends" with Yost while they were in the jail together and that Holland was "closer" with Yost than with Rode.

¶9 Following all testimony, the jury found Yost guilty of disorderly conduct. Yost now appeals.

5

## *Discussion*

¶10  We review a circuit court's evidentiary decisions for an erroneous exercise of discretion. *Gaethke v. Pozder*, 2017 WI App 38, ¶23, 376 Wis. 2d 448, 899 N.W.2d 381. Making an evidentiary ruling based upon an error of law is one way in which a court can erroneously exercise its discretion. *State v. Davis*, 2001 WI 136, ¶28, 248 Wis. 2d 986, 637 N.W.2d 62.

¶11  Yost argues the circuit court erred in preventing Holland from testifying, on the ground of hearsay, that he never heard Yost make a statement threatening his probation agent. We agree. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." WIS. STAT. § 908.01(3). Holland's testimony was that he never heard a certain "statement"/"matter asserted" (i.e., he never heard Yost talk about crimping his agent's brake lines). The absence of a statement/assertion is not a statement/assertion made to prove the "truth of the matter asserted," and thus, Holland's testimony that he did not hear Yost make a statement threatening his probation agent would not meet the statutory definition of hearsay. *See* § 908.01(3); *see also Auseth v. Farmers Mut. Auto. Ins. Co.*, 8 Wis. 2d 627, 630, 99 N.W.2d 700 (1959) ("If the statement is not offered to prove the truth of the fact asserted, then the only thing material is whether the statement was made. As to that fact, there is no more objection to permitting a witness to testify as to what he heard said than as to what he may have observed, and he may be cross-examined as to both."); *State v. Curbello-Rodriguez*, 119 Wis. 2d 414, 427, 351 N.W.2d 758 (Ct. App. 1984) ("The hearsay rule does not prevent a witness from testifying as to what he [or she] heard; it is rather a restriction on the proof of fact through extrajudicial statements." (quoting *Dutton v. Evans*, 400 U.S. 74, 88 (1970)).

¶12    While we believe the circuit court erred in not permitting Holland's testimony that he never heard Yost make a threatening statement with regard to his agent, we believe the error was harmless.  A review of the transcript shows Rode's testimony related to the common-area comments by Yost bears the ring of truth with its specificity and with his additional testimony that he disclosed the common-area conversation to his agent with great reluctance due to fear of potential retribution while in jail.  Further, Yost's agent testified that she had observed Yost to have significant familiarity with the mechanics of cars, such that he likely would have the technical competence to be able to crimp the brake lines of her car.  No suggestion was raised in testimony or closing argument that the agent might not have been truthful about these observations, and no evidence was presented to suggest Rode would have been aware of Yost's apparent competence related to brake-lines sabotage from some other source than Yost himself.

¶13    Furthermore, the circuit court did permit Holland to testify, in direct contradiction to Rode's testimony, that Rode never had a private conversation with him regarding whether Rode should report Yost's common-area comments to any authority.  Additional testimony by Holland that he also did not hear Yost threaten to harm his agent by compromising her brake lines would have added little, especially in light of the very vague nature of Holland's testimony on this point.  While Rode testified that Holland was at the table during the common-area conversation in which Yost purportedly threatened to crimp his agent's brake lines, Holland's proffered testimony was that he was not aware of any such conversation ever occurring.  Holland's proffered testimony was indeed vague as to any particular conversations and times they might have occurred.  Even with regard to the specific brake-lines conversation in the common area, Rode testified at trial that Yost had called his agent a "bitch" during that particular conversation,

yet Holland testified during the offer of proof that he never heard "anything like" Yost calling his agent a "bitch." The jury would have significant reason to question whether Holland would have heard the particulars of the brake-lines discussion even if he had been sitting in close proximity to Yost and Rode when it took place. Based on the vagueness of Holland's offer of proof testimony, if the same was presented to the jury, it would have been easy for the jury to conclude that Yost did indeed engage in the brake-lines discussion with Rode, as Rode testified, but that Holland simply did not hear it, if indeed he was actually sitting nearby during this particular conversation on this particular day. In short, the proffered testimony excluded by the court offered little that had the potential to affect the outcome, and we are convinced beyond a reasonable doubt that had the court permitted the testimony, it would not have altered the outcome of the trial. *See* WIS. STAT. § 805.18(2); ***State v. Carlson***, 2003 WI 40, ¶46, 261 Wis. 2d 97, 661 N.W.2d 51 (We consider an error to be "harmless" and affirm if a court finds beyond a reasonable doubt that a rational jury would have come to the same conclusion absent the error.).

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.