COURT OF APPEALS
DECISION
DATED AND FILED

May 22, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP369-CR**

Cir. Ct. No. **2021CM1454**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

ZACKERY J. OLSON,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Waukesha County: JENNIFER R. DOROW, Judge. *Affirmed*.

¶1 GUNDRUM, P.J.[1] Zackery J. Olson appeals from a judgment of conviction entered after a jury trial for two counts of violating a harassment

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(f) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

injunction, both as a repeater. He contends the circuit court erroneously exercised its discretion by sentencing him to prison instead of placing him on probation. For the following reasons, we disagree and affirm.

## *Background*

¶2 In 2015, Carrie received a ten-year harassment restraining order against Olson, prohibiting him from contacting her, and in 2018, her sister Hannah[2] received a similar four-year restraining order against him. In December 2020, Olson contacted each of them by text message; as a result, he was charged with two counts of violating a harassment injunction, as a repeater. The "repeater" status was due to Olson's 2017 conviction of three counts of violating the 2015 restraining order Carrie had received. A jury found him guilty of both counts stemming from the December 2020 contacts.

¶3 At sentencing, Carrie relayed to the circuit court the terror Olson has caused her for years. She explained how she has to see a counselor "to help find ways to cope with trauma that Olson has caused," adding that she and her husband "have cameras all around our house that instantly alert our phones of any movements" and that she "cannot leave my house for something as simple as a walk outside with my kids without my firearm." "I have been called my girl, baby, little fucking brat, bunny, pussy, cunt, and good little fuck bunny in the numerous voicemails and texts sent by this man," Carrie continued. She relayed how less than two weeks earlier—after Olson had been found guilty at trial but before sentencing—she went to see a band in Elkhart Lake, and

---

[2] Hannah and Carrie are pseudonyms.

2

> [t]he moment we got back to the hotel room, I found that I had three emails from [Olson's email address], timestamped minutes after we entered the concert hall.
>
> I have done nothing but call the cops on him for years now. And he finds it appropriate to email me while out on bail with a sentencing hearing just days away.
>
> My gut tells me he was there watching me the whole time, and it makes me sick to my stomach. I th[a]nk God I was never on my own that night.

Carrie indicated that the Fond du Lac District Attorney's office had charged Olson with ten counts in relation to this incident. She stated that Olson "said himself, you're not going to scare me away with the fucking cops anymore." She added that "[t]he restraining orders and the police warnings won't and haven't scared him away. From what I have witnessed, he will never stop. As long as he's walking around free, he will never stop trying to get to me. And I will never have the chance to live a normal life."

¶4      Carrie continued: "This has been allowed to escalate for far too long, and I don't want to become another statistic. There is nothing more terrifying to me as a woman than knowing someone with no respect for the law is out there holding on to an 18-year sexually charged obsession with you." Carrie asked the circuit court to "impose the longest stay in jail as possible for a second offender and a man as compulsive as Zackery Ols[]on. I also ask[] that he gets intensive psychological therapy while in jail that continues into whatever probation period of time he may be granted." She concluded her comments "with this quote from a voicemail Zackery Olson sent me on February 22nd, 2021:

> You're not going to scare me away with the fucking cops anymore. And you're not gonna keep me at bay by satisfying me with your way of communication. It's a fucking crumb of communication. I'm done. I'm over it. It's old. It's just going to end up pissing me off more. All right? I want the real thing. I need the real thing. I want

my girl. You're my girl. All right? I want my [Carrie]. So I know you're up there with your fucking husband right now. I think your phone is off. You're not his. You belong to—you don't belong to him. All right, [Carrie]? Your pussy belongs to me. Your holes belong to me. Your titties belong to me. You belong to me. Everything belongs to me. All right? And I'm your man. I'm your daddy. All right? This stick is yours. All right? So why don't you come hop on it like a good little fuck bunny that I know you want to be. Quit playing with me. Quit being afraid to admit it. So why don't you pick up your phone when I call your phone? Unblock my number and accept my call and stop being a pussy. I told you things are different. And I fucking mean it. We need to get together. We need to talk. Okay? Because you're not going to keep me at bay anymore. I'm going to go.

¶5 At trial, Carrie testified, inter alia, that on December 24, 2020, she received a text message from an unknown number with a bunny emoji and a message of "[o]nly good little bunnies get their stocking stuffed for Christmas." Carrie received a second text a few days later from the same number with only the bunny emoji. When her sister also received a text from the same number a couple of days later, the two were concerned that the messages had come from Olson. Carrie was "[v]ery" frightened by this, and they contacted the police. Police learned that the text came from a "burner" phone number traced to Olson and contacted him on December 30, 2020. On December 31, 2020, Carrie received another text from a different number she did not recognize, which text stated, "I politely told your friends to piss off yesterday." Police also connected this text to Olson.

¶6 Hannah also spoke briefly at the sentencing hearing, asking the circuit court to "do everything in your power to make sure that [Carrie] is not a statistic." At trial, Hannah had testified, inter alia, that Olson resides five houses away from her, she and Carrie went to elementary school and high school with Olson, and Hannah graduated high school with him in 2006. In her victim impact

statement submitted to the court prior to sentencing, Hannah explained that in May 2017, after being charged with violating the harassment injunction Carrie had, Olson "showed up on my doorstep" and "threatened to come after [Carrie] and our family with everything he had." Subsequently he "called me 8 times" between April 13 and 22, 2018, leading to Hannah's four-year harassment injunction against him. She further stated she refuses to "walk anywhere near [Olson's] house or allow my daughters anywhere near his home for fear that he could try to get to my sister through my own family." And, while she and her husband were away from their home on vacation, they were "terrified to learn that in many of [Olson's] voicemail rants to [Carrie], he spoke about watching our home" and that Olson knew Hannah's car had not been in the driveway for a couple of days.

¶7    The State recommended twelve months confinement on each count, consecutive, pointing out, after referencing the new charges in Fond du Lac County, that Olson "hasn't accepted responsibility." The prosecutor noted a 2010 conviction for possession of narcotic drugs as well as Olson's three prior convictions for violating a restraining order. The prosecutor pointed out that when Carrie got her initial injunction against Olson in 2015,

> the Judge says, "Stop calling her. Stop contacting her." And I think it's very rare that we see a ten-year injunction…. And what that ten-year injunction stated was that the [c]ourt found that he might sexually assault her, like, kill her…. [W]hat we commonly see is the four-year injunction.
>
> And, again, that's back in 2015. And since then, we have seen this continued pattern of conduct and obsession and harassment.

The prosecutor stated, "[N]ow things … have escalated. Because now he's not using his phone number. Now he's concealing his phone number. And he's

calling or texting both [Hannah] and [Carrie]. Again, he knows he can't contact them…. And he starts contacting them again." She informed the court that Olson has contacted Carrie "over 749 times. Voicemails, messages." She mentioned that the voicemails

> are sick and perverse, and sexually explicit. And again, this isn't somebody who's ever had a relationship with the defendant. Neither [Hannah] nor [Carrie]. And this escalation of now he's not just contacting them or sending emoji's, now he's leaving these perverse voicemails on her phone. And as [Carrie] describes, what are you supposed to do? He's now had judges tell him to stop contacting her. He's had commissioners. He's been repeatedly told on bail to stop contacting. And he continues to do it.
>
> ….
>
> The most recent case, obviously, just happened a week and half ago ….
>
> … He served nine months' jail straight time. That didn't do it. He served two years' probation. That didn't do it. I think that the only way that these victims have any sense of safety is if he's in custody.

The prosecutor indicated she was not convinced Olson had any probationary needs, stating,

> [Y]ou know, he did the mental health eval[uation]. I believe that was ordered on the last probation sentence…. I don't know that this is a mental health issue. This is a stop contacting them. They don't want anything to do with you. Stop.…
>
> What else can we do? The only reasonable option that the State sees is that he's locked up. And that's why I am recommending a very lengthy sentence in jail, because I don't see any other way to stop him. Nine months wasn't enough…. [A]t some point, we have to at least take him out of the community so these victims can go to sleep at night….
>
> … [And] a lengthy sentence is absolutely necessary to impress upon him to stop.

¶8      In his comments, counsel for Olson urged the court not "to give that much weight [to the charged offenses in Fond du Lac] because he hasn't been convicted. He hasn't had an opportunity to defend himself in those cases yet." Counsel requested probation for Olson, along with mental health treatment or counseling.

¶9      When Olson spoke, he told the circuit court that

> [t]here's a lot of things that [Carrie] and [Hannah] are not being truthful about and that they're keeping from people….
>
> I don't know if they're doing this willingly because they're out to get me, or if they're being forced or pressured into doing these things against me and saying these things against me by someone else that they're not mentioning.
>
> [Carrie's] and [Hannah's] statements and comments and testimony evolving over the years have significantly impacted my mental health and my life in negative ways. And it's convinced a lot of people that I'm something that I'm not. It's made me fear for my life at times. And the only person who is at risk of being harmed or injured or even killed here is me. I have received anonymous death threats throughout the years from people….
>
> The reason why everything seems so unknown is because the truth is that [Carrie] and I have been having an affair, and she is keeping it from her husband….
>
> … [A]s the defendant in these cases, I find myself in a very uncomfortable situation right now. Because … there is so much that I want to say and that needs to come out, I wasn't prepared … to be saying it here today. I didn't think all this stuff was going to get brought up from the Fond du Lac stuff ….
>
>      ….
>
> … I'm going to urge [Carrie] or [Hannah] to tell the truth…. I believe that [Carrie] is afraid of her husband finding this stuff out …. I believe that she's afraid he is going to harm her or me to find out that his wife has been having an affair.

7

He stated that "[t]his secret relationship has been going on for seven years. And it scares me to hear [Carrie] read these statements against me. Because it's … so unlike her and her sister, [Hannah]." Olson urged the court to withhold sentencing "until after the outcome of the Fond du Lac trial has concluded so that all of the relevant facts and information have come out, and I can speak a little more freely and open about all this stuff so that you can pass down a more appropriate sentence."

¶10 The circuit court spoke next. The court noted that the jury found Hannah and Carrie credible and that this case actually began seven years earlier when Carrie was issued a ten-year restraining order "because of what a court official found to be credible in terms of the evidence before that court official." The court emphasized that "[c]ourt commissioners, judges, probation agents, prosecutors, [and] the victims themselves have all repeatedly told you do not have contact in any form or fashion…. And you have shown through your repeated behavior, the rules don't matter to you." In clear reference to the new charges from Fond du Lac County, the court cited to *State v. Von Loh*, 157 Wis. 2d 91, 458 N.W.2d 556 (Ct. App. 1990), *State v. Frey*, 2012 WI 99, 343 Wis. 2d 358, 817 N.W.2d 436, and *State v. Leitner*, 2002 WI 77, 253 Wis. 2d 449, 646 N.W.2d 341, and informed Olson it may consider

> [h]istory of undesirable behavioral patterns, including dismissed, uncharged, or unproven offenses or facts underlying even expuged offenses, and including conduct for which defendant was acquitted, if relevant.
>
> So your conduct in any way shape or form that relates to having contact with [Hannah] and [Carrie] is fair game and on the table for me to consider.

The court further stated, however, that it did not "need to even consider … the pending charges in Fond du Lac to know that you have a disturbing and vile

obsession with [Carrie]. That's been made clear. You've had a pattern of disregarding court orders, whether they be restraining oral orders, [or] conditions of bond."

¶11 The circuit court continued:

> Your conduct, to say is bizarre and intense, would be an understatement…. Bizarre, intense—what appears to be sexually motivated by you—behavior, claiming today to have this seven-year affair with someone who credibly testified before this [c]ourt about not wanting to have any contact with you. Both her and her sister talk about—in their victim impact statements—the effect, the impact, the fear, how it affects their mental health, their family, they exercise their Second Amendment rights to have firearms in their home to protect themselves.
>
> The impact on a victim is a legitimate sentencing criteria. You know, in and of themselves, a violation of an injunction is a fairly minor misdemeanor. Of course, in this case, it comes with the history of having been convicted of three prior charges of a similar nature. So that's very, very aggravated. One would have hoped that being held accountable by a judge, being put on probation, and at one point, having nine months' imposed, would be enough to send a very clear message to you that no contact means no contact. But that has not been the case.

The court also noted "there's some elements of concealing your identity with phone numbers and how it was all found out."

¶12 The circuit court indicated that Olson's prior record was an aggravating factor. Also related to Olson's character, the court noted that he has been able to sustain employment and has the support of family and friends, but he had "done nothing today to demonstrate to this [c]ourt that you take responsibility, that you are apologetic or remorseful. On the contrary, you blame the victim. There's absolutely no acceptance of responsibility by you." Instead, Olson spoke

of "this big secret affair. And, again, attempt to deflect away from your own behavior."

¶13 The circuit court expressed that putting Olson on probation would "unduly depreciate the seriousness of these offenses," further stating that "[c]onfinement is necessary to protect the public, which the public includes these victims[,] from further criminal activity by you." The court imposed a sentence of twelve months of initial confinement followed by three months of extended supervision, consecutive, for each count. The court did so because "[t]o do anything other than that would be to give you the absolute wrong message that continued violations of this restraining order are tolerated. Because they are not. You must stop." "These are consecutive sentences," the court continued, "[a]gain, because to do anything other than that would be to send a very wrong message to Mr. Olson that this behavior is tolerated. It is not tolerated. Your history, your lack of remorse, your deflection, and blame of the victims is, frankly, despicable, sir. And punishment is what is in order."

¶14 Olson appeals.

### *Discussion*

¶15 Olson contends the circuit court erred in sentencing him to prison instead of placing him on probation. More specifically, he asserts the court erroneously sentenced him based upon its belief he lacked remorse and upon the newly charged offenses in Fond du Lac County. He maintains he merely exerted his right to a trial, and the Fond du Lac County charges "should not have been used against [him]." We conclude the court did not err.

¶16 "Sentencing lies within the discretion of the circuit court." *State v. Kuechler*, 2003 WI App 245, ¶7, 268 Wis. 2d 192, 673 N.W.2d 335. Thus, on appeal, we will not reverse the court's imposed sentence absent an erroneous exercise of discretion. *See id.* "A circuit court erroneously exercises its sentencing discretion when it actually relies on clearly irrelevant or improper factors." *State v. Whitaker*, 2022 WI 54, ¶11, 402 Wis. 2d 735, 976 N.W.2d 304. Thus, "a defendant challenging his or her sentence must prove by clear and convincing evidence that: (1) the challenged factor is irrelevant or improper; and (2) the circuit court actually relied on that factor." *Id.* Our supreme court has recognized a "strong public policy against interference with the sentencing discretion of the [circuit] court and sentences are afforded the presumption that the [circuit] court acted reasonably." *State v. Echols*, 175 Wis. 2d 653, 681-82, 499 N.W.2d 631 (1993) (citation omitted).

¶17 Olson challenged at trial the two counts of violating a harassment injunction, and he lost. As the circuit court noted, the jury found Hannah and Carrie credible, and it convicted him of those two counts. After these impartial fact finders found him guilty, he had the opportunity at sentencing to apologize to Hannah and Carrie for any fear and concern he had caused them and assure them he would not contact them in the future. Instead, he took a radically different tact of blaming Hannah and Carrie and concocting a story of a seven-year affair with Carrie. The court obviously believed Carrie when she informed the court at sentencing of the message Olson left on her voicemail in February 2021. That message would cause any court—any human, for that matter—grave concern as to the danger Olson posed to Carrie and her family. The court noted Olson's dangerous history, particularly with regard to these two victims, its great concern for his lack of remorse, and the fact he has been told by the numerous criminal

11

justice authorities, and of course the victims, to cease having contact with the victims.

¶18    The circuit court indicated it need not consider the new Fond du Lac charges "to know that you have a disturbing and vile obsession with [Carrie]." Even if it had considered the allegations in those charges, such would be appropriate under the law. *See Leitner*, 253 Wis. 2d 449, ¶45 ("In Wisconsin, sentencing courts are obliged to acquire the 'full knowledge of the character and behavior pattern of the convicted defendant before imposing sentence.' A sentencing court may consider uncharged and unproven offenses and facts related to offenses for which the defendant has been acquitted. To assure that a circuit court has full information, prosecutors may not keep relevant information from a sentencing court." (citations omitted)). As to Olson's lack of remorse, that too was a legitimate consideration for the court in sentencing him. *See Whitaker*, 402 Wis. 2d 735, ¶12 (recognizing a defendant's remorse as a "[s]econdary factor[]" a court can consider in sentencing a defendant).

¶19    The circuit court explained why probation was out of the question and a strong prison sentence was necessary: "To do anything other than that would be to give you the absolute wrong message that continued violations of this restraining order are tolerated. Because they are not. You must stop." The court expressed that Olson needed to be punished and that confinement was necessary to protect the victims "from further criminal activity by you." The court's focus on deterring Olson from future contact with Hannah and Carrie was also a completely legitimate consideration. *See State v. Gallion*, 2004 WI 42, ¶40, 270 Wis. 2d 535, 678 N.W.2d 197 (stating that punishment of the offender, protection of the community, and deterrence are proper sentencing objectives).

¶20 On appeal, an appellant, such as Olson, bears the burden of demonstrating that the circuit court erred. *See **Gaethke v. Pozder***, 2017 WI App 38, ¶36, 376 Wis. 2d 448, 899 N.W.2d 381. He has not met that burden.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.