**COURT OF APPEALS
DECISION
DATED AND FILED**

**September 28, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP426**

Cir. Ct. No. **2021ME165**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

IN THE MATTER OF THE MENTAL COMMITMENT OF P.W.S.:

SHEBOYGAN COUNTY HUMAN SERVICES DEPT.,

PETITIONER-RESPONDENT,

V.

P.W.S.,

RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Sheboygan County: DANIEL J. BOROWSKI, Judge. *Affirmed*.

¶1 GUNDRUM, P.J.[1] P.W.S. appeals from an order of the circuit court for involuntary commitment pursuant to WIS. STAT. ch. 51. He asserts the

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

Sheboygan County Human Services Department (County) failed to prove he was dangerous under WIS. STAT. § 51.20(1)(a)2.c. "[b]ecause there was no evidence at the final hearing to support a determination of any 'substantial probability of physical impairment or injury' to [P.W.S.] or another person." For the following reasons, we disagree and affirm.

## *Background*

¶2 On September 17, 2021, P.W.S. was emergently detained pursuant to WIS. STAT. ch. 51, and the County sought a court order for his commitment as well as for the involuntary administration of medication and treatment. The circuit court held a final hearing, after which it entered orders committing P.W.S. for six months and ordering involuntary medication and treatment. P.W.S. appeals only the commitment order. The following relevant evidence was presented at the final hearing.

¶3 Psychiatrist Dr. Robert Rawski's written evaluation report, which was entered into evidence and specifically relied upon by the circuit court in its ruling, indicates, based upon police reports, that on September 17, 2021, a "[s]heriff's deputy was dispatched to [P.W.S.'s] residence in response to his call about unknown individuals entering his home and stealing his property." This was the twelfth call in approximately nine months in which P.W.S. contacted the sheriff's department with complaints about burglary and theft, "none of which have ever been confirmed with evidence and were considered to be related to untreated mental illness."

¶4 When the deputy arrived at P.W.S.'s home, P.W.S. was "standing in the driveway holding a handgun straight out in front of him but pointing toward the ground." When asked, P.W.S. stated that it was only a BB gun. The deputy confirmed this but observed that it "did not have its characteristic markings to

distinguish it from an actual handgun." This same deputy had been to the property on August 21, 2021, for a similar call, and P.W.S. was carrying a loaded .22-caliber handgun. At that time, P.W.S. "stated that he needed to carry it to protect his property and take care of anyone who would trespass upon it." Out of apparent concern that law enforcement would stop responding to his calls in the future, P.W.S. told law enforcement, as Rawski quoted from the police report, that "he would have to shoot the trespassers to get the law enforcement's attention."

¶5 P.W.S.'s home was largely "covered in piles of garbage and miscellaneous items that were rotting and covered in mold and dirt," and there was "an overpowering odor of rot and mildew…. [I]nterior walls were gutted and the drywall and insulation was removed and spread over the stairs." In areas of the residence there was "trash and garbage piled to the ceiling." A trailer on the property, in which P.W.S. had more recently been living, had "numerous piles of garbage and trash" and also "smelled of mold and mildew. The deputy noticed piles of rotten food covered in mold." When this deputy had been to the property on August 21, 2021, the property had appeared in approximately the same condition.

¶6 Deputies and "[c]risis staff" pursued the WIS. STAT. ch. 51 emergency detention on September 17, 2021, and did so, based on reports Rawski reviewed, "out of concern that [P.W.S.'s] delusions and hallucinations were influencing his behavior to the point that he could mistakenly shoot someone he misconstrued to be an intruder." On that date, P.W.S. also reportedly stated to law enforcement, as Rawski quoted from the police report, "If you guys don't believe me, you will when I shoot one of them." Law enforcement was "specifically fearful that he might shoot a [mail] carrier or delivery driver if he misperceived them to be a burglar." P.W.S. told an emergency room nurse "that he made the statement about hurting someone to get police attention so that they would keep responding to his calls. It was noted

that he had not been overtly threatening with the weapon in police presence." According to a report from his long-time psychiatrist, Dr. Stephen Krummel, as reported by Rawski, P.W.S. told Krummel "that he purchased the BB gun for protection and to corner the persecutors to keep them until police arrived."

¶7 According to a crisis worker report, at the emergency room, P.W.S. identified, as Rawski reported it, a "specific target, a neighbor who lived across the road." P.W.S. "explained that he had recently obtained two BB guns to hold the burglars at bay once he was finally able to corner them." Because he was not able to find the BB guns, however, P.W.S. had procured the handgun that he was carrying on August 21, 2021. P.W.S. further explained "that he had been unable to sleep because he was concerned that burglars would intrude and steal from him during the night" and "that the persecutors were walking around the trailer making animal noises, whispering his name, banging on the outside, and moving the door latch in order to aggravate him."

¶8 According to one report, in discussing a fall that the sixty-seven-year-old P.W.S. recently had experienced, as Rawski stated it, P.W.S. indicated "that the only reason he fell was because of the stress caused by the intruder breaking in." P.W.S. also "described once seeing two girls acting as lookouts in the tall grass near his residence and falling when trying to run out to apprehend them."

¶9 Rawski's report indicates that when Rawski asked P.W.S. how he has responded to "repeated intrusions," P.W.S. explained that he had "la[id] down a booby trap involving a piece of wood with sharp nails sticking up from it." When asked about the firearms, P.W.S. "stated that the burglar and his accomplices disappeared so quickly that he wants to keep them stationary until police can apprehend them." P.W.S. "repeatedly stated that he had no interest in hurting

anybody… [and] … only wished to use the firearm to hold the burglars at bay while waiting for the police to arrive since they always escape otherwise." When Rawski specifically asked P.W.S. about his comment related to shooting one of the intruders if law enforcement did not believe him that they were real, P.W.S. "insisted that he did not plan to shoot anybody, had no intention to harm anybody, and hence purchased a BB gun," although he acknowledged borrowing a handgun when he could not find his BB guns.

¶10    Rawski concluded in his report that P.W.S.'s judgment over the last year "has been repeatedly impaired by his delusional beliefs." Rawski diagnosed him with "Unspecified Psychotic Disorder," which "is a treatable mental illness featuring a substantial disorder of thought and perception that grossly impairs his judgment, behavior and capacity to recognize reality." Rawski observed P.W.S. to have "an escalating delusional fixation supported by auditory hallucinations that has influenced his behavior to the degree that he is arming himself with BB guns or handguns. The risk of misidentifying a visitor to the property or a child or adult simply passing through for innocent reasons and acting impulsively is unnecessarily palpable." P.W.S. "is clearly deeply convinced that he is being harassed on a near-daily basis at this point. His symptoms are interfering with his sleep, which would be expected to increase the likelihood of further hallucinations and interfere with his ability to realistically identify any actual risks of his external environment." Treating him would "protect[] the community and himself in response to the potential for aggression out of a perceived need for self-defense or retaliation for confrontation over his delusional beliefs." Among other relevant opinions, Rawski opined that P.W.S. "poses a substantial probability of harm to himself and others secondary to persecutory delusions fueled by auditory hallucinations, arming himself in preparation to confront his perceived persecutors and/or preemptively

aggress under the weight of his perceived torment." Rawski further opined that P.W.S. "puts himself at risk for harm through retaliation or aggression in self-defense under those circumstances."

¶11 In his testimony at the final hearing, Rawski repeated much of the above from his report. He stated that his evaluation of P.W.S. involved meeting with him and reviewing emergency detention paperwork, police reports, and medical records. Rawski testified that:

> Over this last year, [P.W.S.] has developed a number of delusional conclusions about persecutors and has narrowed it down to one specific neighbor he believes is repeatedly burglarizing his home, hides in the home, hides in his cars, has evaded deputies' investigations and searches on several occasions, and has caused [P.W.S.] such distress that he has moved from laying booby traps for the burglar to now arming himself and staying awake at night and vigilantly watching the property for these intrusions.
>
> … [T]he concern has grown now due to the distress, the dysfunction, and the arming himself with weapons against perceived persecutors that puts him at risk for misinterpreting someone else and harming them out of delusional misperceptions or putting himself at risk for being harmed in response to the perceived need for self-defense.

¶12 When specifically asked if P.W.S. posed a danger to himself or others, Rawski responded:

> Yes. If he was just experiencing these symptoms and was taking up the time of law enforcement to come out repeatedly to check on these things, he would not likely be a candidate for an emergency detention or a civil commitment because it's just like the disruption and the extensive use of resources that should be dedicated elsewhere.
>
> However, … when the delusions influence the decisions and the judgment and the behavior to the point where he's now arming himself, first with BB guns, then with … an actual handgun, loaded, on his person, while he's scanning the property and concerned that there are active persecutors hiding in the home or hiding in one of the vehicles on the

6

> property, that increases the likelihood of him misinterpreting … the events in his environment and acting impulsively in response to a perceived need to defend himself or his property.
>
> When you talk to him about this, he states that he does not intend to hurt anyone, and I believe that. He—he wants the persecution to stop, but now he's moved to taking up arms to defend himself against delusional persecutors and has identified the specific neighbor.
>
> The next step is to begin confronting the neighbor … and if he's armed in doing that, … that's how these dangerous incidents occur.

When asked if P.W.S. "has such impaired judgment that there's a substantial probability of physical impairment or injury to himself or others," Rawski responded in the affirmative.

¶13 As part of his evaluation, Rawski specifically asked P.W.S. about his comment related to shooting one of the intruders if law enforcement did not believe him that the intruders were real. In response, P.W.S. indicated to Rawski that he did not "sa[y] it the way that it was described." Rawski testified that "throughout the hospitalization and at least three times during my interview, [P.W.S.] repeatedly describe[d] that he armed himself with these weapons in order to … once finally be[] able to confront the persecutors on the property to hold them at bay so that police could arrive and actually apprehend them."

¶14 Rawski expressed that P.W.S.'s illness was "worsening." He continued:

> And based upon my experience with individuals on both sides of incidents of—that are—of dangerous behavior with firearms that are the direct result of untreated symptoms of mental illness, both in preventative civil commitment matters as well as post-incident criminal evaluations, you can trace the movements from the initial concerns, the development of the delusions, the rising distress, … the less-lethal means of trying to get relief, and then the final

> desperation … toward an incident that results in using the firearm in a situation that was entirely preventable had the person been treated for mental illness.
>
> This case is following in that direction.

¶15 P.W.S.'s son also testified, stating reasons why he believed someone was in fact burglarizing P.W.S.'s home.

¶16 Following testimony, the circuit court found that Rawski was "quite convincing." It stated in relevant part:

> I don't think there's any question based on the doctor's testimony that [P.W.S.] is mentally ill, suffers from a substantial disorder of thought, mood, perception, orientation, memory, which grossly impairs judgment, behavior, capacity to recognize reality, or to meet the demands of life, and that's an unspecified psychotic disorder as the doctor has indicated….
>
> ….
>
> … [P.W.S.'s mental health] is certainly impairing on his ability to perceive reality.
>
> ….
>
> … I don't think there's any question [the hallucinations are] occurring based on Dr. Rawski's testimony that [P.W.S.] is, by virtue of his mental illness, unable to perceive and recognize reality…. [M]ore recently, in multiple law enforcement contacts, reports of burglars in the home, and then there's the surrounding circumstances of a home that has mold, mildew, by admissions, garbage, a hole in the roof, raccoons, a trailer which is similarly dilapidated.

The circuit court further detailed numerous additional points from Rawski's report, based upon P.W.S.'s own statements, which demonstrated that P.W.S. is "complete[ly] detach[ed] from reality."

¶17 Specifically turning to the question of dangerousness, the court stated:

8

I don't think there's also any question that he is now exhibiting such impaired judgment manifested by evidence of … a pattern of recent acts or omissions that there's a substantial probability of physical impairment or injury to himself or other individuals.

… [His] mental health has deteriorated due to the unspecified psychotic disorder, he's hallucinating and has a profound inability to discriminate between what is real and what is not. What makes this more troubling, as the doctor noted, and I think it's part of the lynchpin in the case, is his choice to arm himself … with … a .22 handgun and a BB gun.

And it's a BB gun that … looks like a real gun .…

… [H]e indicates that he has come to the point where, you know, he's going to teach someone a lesson and shoot them. And you sort of worry about the innocent passerby, someone might be a salesperson, whatever, approaching the residence, and ultimately getting shot because [P.W.S.] has these delusions.

On the flip side, it could also be as Dr. Rawski indicated, that [P.W.S.] pulls this BB gun, which apparently it is a BB gun that looks like a real gun, and … either the police or perhaps someone else perceives [P.W.S.] as a real threat and they shoot him. This is serious stuff, and it's dangerousness, and it's not something that can be fixed without addressing the underlying mental illness.

And it really does pose a profound risk, and there's clear, convincing, satisfactory evidence, again, that he is dangerous under the third standard. And you always have to—as part of that, just look at the collateral facts, as well, that surround all this.

I mean, he's not able to care for himself. We just heard [his son] testify … that [P.W.S.] moved out to the trailer because he's living in a dilapidated residence, and it's all evidence of [a] constellation of facts combined with hallucinations that create just a profound risk of harm to himself or others due to his impaired judgment and patterns of behaviors, acts, and omissions.

¶18    As stated, P.W.S. appeals the commitment order.

9

### *Discussion*

¶19    As relevant here, in order to involuntarily commit P.W.S. pursuant to WIS. STAT. ch. 51, the County had to prove by clear and convincing evidence that he was mentally ill, a proper subject for treatment, and dangerous to himself or others. *See* ***Langlade County v. D.J.W.***, 2020 WI 41, ¶29, 391 Wis. 2d 231, 942 N.W.2d 277; WIS. STAT. § 51.20(1)(a), (13)(e). P.W.S. does not dispute the circuit court's conclusions that he was mentally ill and a proper subject for treatment. He insists, however, that the court erred in concluding the County met its burden to prove he was dangerous. We disagree.

¶20    Whether the County met its burden to prove P.W.S. was dangerous presents a mixed question of law and fact. *See* ***Waukesha County v. J.W.J.***, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. "[T]he circuit court's findings of fact are reviewed for clear error," and "we accept reasonable inferences from the facts." ***Winnebago County v. Christopher S.***, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (citation omitted). Application of the facts to the statute and interpretation of the statute are matters we review independently. ***Id.*** "A determination of dangerousness is not a factual determination, but a legal one based on underlying facts," ***D.J.W.***, 391 Wis. 2d 231, ¶47; we also review that determination independently, ***id.***, ¶25.

¶21    Here, the County asserted, and the circuit court concluded, that P.W.S. met the standard for dangerousness under subd. para. c. of WIS. STAT. § 51.20(1)(a)2. Under this standard, the County was required to show, as relevant here, that P.W.S. "[e]vidences such impaired judgment, manifested by evidence of a pattern of recent acts ..., that there is a substantial probability of physical ... injury to himself … or other individuals." *See* § 51.20(1)(a)2.c. "[S]ubstantial

probability" means "much more likely than not." *See **Marathon County v. D.K.**,* 2020 WI 8, ¶35, 390 Wis. 2d 50, 937 N.W.2d 901 (citation omitted). On appeal, P.W.S. has the burden to show the circuit court erred. *See **Gaethke v. Pozder**,* 2017 WI App 38, ¶36, 376 Wis. 2d 448, 899 N.W.2d 381. He has not met this burden; we agree with the court that this dangerousness standard was met.

¶22 The court found that P.W.S. was unquestionably delusional, and that finding is supported by the evidence. Relatedly, whether it was setting up more dangerous "booby traps"—like the one "with sharp nails sticking up"—that could victimize an unsuspecting mail carrier or Amazon delivery person, brandishing a BB gun that looks to responding police and others like a real gun, shooting someone with a real gun—like the *loaded* .22-caliber handgun he carried at the time of the "burglary" call he made in August 2021, falling again while trying to apprehend imaginary intruders or "lookouts"—like the two imaginary girls he chased after that resulted in a fall, or confronting, perhaps while armed, the neighbor he believes is stealing from him, the totality of the evidence, *see **D.K.**,* 390 Wis. 2d 50, ¶51 (we consider dangerousness evidence from commitment hearings "as a whole"), indicates P.W.S.'s judgment was so impaired that there was "a substantial probability of physical … injury to himself … or other individuals." *See* WIS. STAT. § 51.20(1)(a)2.c. Rawski noted in his report that P.W.S. had an

> escalating delusional fixation supported by auditory hallucinations that has influenced his behavior to the degree that he is arming himself with BB guns or [loaded] handguns. The risk of misidentifying a visitor to the property or a child or adult simply passing through for innocent reasons and acting impulsively is unnecessarily palpable.

Rawski expressed additional concern that P.W.S.'s symptoms were "interfering with his sleep, which would be expected to increase the likelihood of further

hallucinations and interfere with his ability to realistically identify any actual risks of his external environment." Both Rawski and the circuit court concluded that the evidence showed this, and we agree.

¶23 P.W.S. asserts that the circuit court erred in finding that he "indicated that he has come to the point where … he's going to teach someone a lesson and shoot them." He claims this "factual finding was clearly erroneous as it is unsupported by the evidence before the court in the final hearing." We disagree as P.W.S. did indicate he might do just that.

¶24 P.W.S. asserts that he made this statement out of "frustration" that law enforcement did not believe his reports of an intruder and that this somehow negates the threat P.W.S. posed to himself and others. On the contrary, undoubtedly many people commit criminal harm against others out of "frustration." Perhaps P.W.S. did not actually intend to shoot someone to get law enforcement's attention, but the court was not obligated to ignore his statements or to assume this clearly delusional individual would not actually shoot someone out of "frustration."

¶25 P.W.S. carried a BB gun and a loaded .22-caliber handgun. When carrying the loaded handgun on August 21, 2021, he expressed that he "needed to carry it to protect his property and *take care of anyone who would trespass upon it*." (Emphasis added.) This suggests he was contemplating doing much more than giving a trespasser milk and cookies. He indicated frustration that law enforcement did not believe his reports of a burglar as well as concern that law enforcement might stop responding to his calls. He also presented himself as ready to take matters into his own hands—and with an armed ability to do so. Whether it was to "take care of trespassers" or to "show" law enforcement that his reports of intruders were real, by all indications, P.W.S. appeared prepared to discharge his weapon at a perceived

intruder on his property, all while having a mental illness that made it quite likely he would misperceive an innocent person to be an intruder.

¶26 For the foregoing reasons, we conclude that the evidence introduced at the final hearing supported the circuit court's conclusion that P.W.S. was dangerous pursuant to WIS. STAT. § 51.20(1)(a)2.c.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.