**COURT OF APPEALS
DECISION
DATED AND FILED**

**November 6, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1315**

Cir. Ct. No. **2023ME217**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

---

IN THE MATTER OF THE MENTAL COMMITMENT OF M.D.S., JR.:

WAUKESHA COUNTY,

    PETITIONER-RESPONDENT,

  V.

M.D.S., JR.,

    RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Waukesha County: PAUL F. REILLY, Reserve Judge. *Affirmed.*

¶1 GUNDRUM, P.J.[1] M.D.S., Jr., referred to herein by the pseudonym Martin Smith,[2] appeals from an order involuntarily committing him under WIS. STAT. ch. 51 and a related order allowing for the involuntary administration of medication and treatment. He contends the circuit court applied the incorrect legal standard and ultimately, Waukesha County failed to prove he was dangerous under WIS. STAT. § 51.20(1)(a)2.b. We disagree and affirm.

## *Background*

¶2 On June 14, 2023, Smith was emergently detained pursuant to WIS. STAT. § 51.15, and the County sought a court order for his commitment as well as for the involuntary administration of medication and treatment. The circuit court held a probable cause hearing on June 19, 2023, at which it found, based on Smith's stipulation, probable cause to believe that Smith was "a danger to himself or others." The court scheduled a final hearing for June 27, 2023, at which, the following relevant evidence was presented.

¶3 Alec W. testified that he called the police on June 14, 2023, because of concerning conduct by Smith. Specifically, Alec was moving items into his brother and father's apartment when Smith, who "didn't seem like he was fully coherent," approached Alec and "proceeded to come closer to us [but] wasn't saying anything." Smith continued "to come up to us and was kind of getting in our personal space … bothering us." Smith "tr[ied] to follow us in[to] the house,"

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] We use a pseudonym because we believe it makes the decision easier to read and is more humanizing than initials.

2

and Alec communicated to him that he should "back off." Smith continued to "stay in our personal space. He was trying to put his hands and arms around us [and] kept kind of growling, making weird noises." Alec told Smith to "back up," and Smith

> was still kind of growling, saying weird stuff, running around, pulling on his shirt. And then he kind of got close to us again. He kind of got into my space to the point where he … kind of looked like he was going to charge at me, but I was, like, I don't think he was going to ….

After Smith laid hands on Alec, Alec "pushed him off me just enough to get my space, and then I grabbed my phone and I called 911." Alec expressed that Smith "definitely would have [entered into his brother and father's apartment] had we not shut the door," with Alec "pretty much block[ing]" Smith.

¶4 Alec testified that "the reason that I think I called the cops was [Smith] started making gun signs with his hands," and Alec demonstrated how Smith pointed with his index finger and middle finger and his thumb in the air, pulling his thumb down. After that, Alec "was trying to … gauge if [Smith] ha[d] any weapons on him" and concluded that it did not appear so. Smith "was saying some biblical reference stuff" and "could tell that I was on the phone with the cops," and "he kept saying it was going to be a showdown or kept saying something, and kept making these gun signs … you know, pointing, whatever."

¶5 On cross-examination, Alec stated that "[t]he main reason [he called law enforcement] was the fact that [Smith] was getting in my personal space and was clearly unhinged and didn't seem to have much control over what he was doing," explaining that by "unhinged," he meant "shouting, growling … acting as if he was not mentally stable at the time being. Like his actions could spark off at any moment." Alec clarified that he did not push Smith but that Smith "got into

3

my personal space and pushed me and put his hands on me, and I was removing him from my space"; multiple times, Alec told Smith to "keep his distance." Alec acknowledged that Smith did not cause him any physical pain.

¶6 Alec explained that after he called law enforcement, he followed Smith around to "mak[e] sure he didn't go inside of his house and go to grab a weapon as he clearly stated." Alec reiterated that Smith "was pulling a fake trigger on a gun with his hand saying multiple times that it was going to be a showdown when the cops got there."

¶7 A police officer testified that when she encountered Smith, in restraints, at the hospital on June 14, 2023, he

> was speaking to biblical individuals who were not present in the room, along with speaking with the Pope. There were multiple different conversations that [Smith] was having with those individuals that weren't present. And there [were] times where he would be yelling and screaming, and at times in a closed, clinched [sic] fists with folds [sic] out of his bed, making threats or speaking to those individuals. At one moment [Smith], I believe, was speaking to the Pope or a biblical prophet and stated that he had mercy on that individual, otherwise he was going to harm them.

The officer stated that at one point Smith "had stated that he was going to use a rifle to harm that individual, that person that wasn't present in the room." On cross-examination, the officer acknowledged she did not see Smith "get physical with anyone" and that the threatening statements Smith made were "to nonpresent individuals."

¶8 Dr. Darryl Kabins, Smith's treating psychiatrist who was also medical director at the Waukesha County Mental Health Center, testified that in addition to treating Smith, he also had "reviewed his emergency detention [and]

talked over the phone with his outpatient psychiatrist … from the VA." Kabins testified that Smith suffers from schizophrenia, which causes impaired judgment, thought disorganization, and paranoid delusions about being harassed by the police. Kabins added that Smith is "reluctant to come up with a plan to stay away from the police to avoid an altercation as he feels like he needs to keep doing that." Smith

> also refers to this battle of religious people that he's not clear who it is…. Not clear whether []he's hearing voices or talking to himself. He's disorganized regarding that. But he cannot put together a clear plan how to manage his paranoia safely and continues to make statements that he'll continue the behaviors that ultimately led to his detainment.

¶9 When asked if the behaviors that led to his detainment and his impaired judgement "make it much more likely than not that physical injury or impairment to himself or others will occur," Kabins responded that Smith is

> at definitely increased risk of harm to self [or] others as he keeps escalating trying to pursue something that he's not sure what he's trying to pursue other than being harassed by the police. With the reported statements that he had made in emergency detention about standoffs and the detention while he was psychotic, making statements about killing the Pope. Not that he's going to but that he has rifles to kill the Pope, and I can't get him to come up with a sufficient safety plan on how to manage that paranoia safely.

When asked if Smith needs continued inpatient care, Kabins responded,

> [h]e is showing some improvement, but he continues to have disorganized thoughts and delusional beliefs that lead[] to him continuing to state that he plans to actively monitor the police that he perceives are harassing him. And he's not able to come up with a goal of what he's trying to accomplish or show awareness of how his behaviors in response to his paranoid delusions have put himself in altercations with others that have led to reports of him pushing somebody and making statements about potentially dangerous things like standoffs.

¶10    Kabins stated that he had spoken with Smith earlier in the day "about some side effects he may be having from his antipsychotic medication" and possible alternatives to remaining on the same medication path. In talking with Smith as well as his outpatient psychiatrist, Kabins learned that Smith

> has been noncompliant with antipsychotic medications for his schizophrenia over the past year and continues to present high risk to be noncompliant, even though he's compliant here, as he does not like the medications. And he acknowledged to me he would be high risk not to take it as it's causing some of the side effects that he was telling me about today.

¶11    Kabins stated that when he has asked Smith about his access to firearms, Smith "chooses not to disclose to me. The only thing he has disclosed to me is that he has a concealed carry card that he was hoping to be able to maintain." When asked, Smith "would never tell [Kabins] whether he actually does have firearms."

¶12    On cross-examination, Kabins stated that Smith

> says he understands that he needs to be on medication, [but] he hasn't been able to clearly verbalize to me the symptoms that he's having of his schizophrenia that require the medications, because although he acknowledges his schizophrenia, he does not acknowledge that the struggles he's having with police [are] part of that.
>
> So he remains at high risk for noncompliance with antipsychotic medication without being on an injectable medication.

Kabins indicated that Smith "is showing some improvement on the antipsychotic medication that has helped him to not be agitated."

¶13    In its ruling, the circuit court stated that

> had this ended at the time that [Alec] called the police and the police came and took [Smith] in based upon what

clearly … were delusionary statements, and the testimony from [the officer] speaks to that, that may not show dangerousness.

But when if you look at the gun signals and the references, and I took [Alec's] testimony … that after [Smith] tried to enter the apartment that apparently did not belong to him, and [Alec] was concerned about safety, it was at that point that [Smith] started making gun signs with his hands and pointing the gun signs at [Alec], making some biblical references and then saying "it's going to be a showdown."

So putting that all into context, I have no question whatsoever that that is a threat to do harm to others and it meets the standard under [WIS. STAT. §] 51.20(1)(a)2.b. of others being placed in reasonable fear of violent behavior or serious physical harm as evidenced by a recent overt acts [sic], attempts or threat to do such harm to other[s].

… [T]he County by clear and convincing evidence proved the dangerous component under [subd. para. b].

The court entered orders committing Smith for six months and allowing his involuntary medication and treatment during that time. Smith appeals.

## *Discussion*

¶14    A person is a proper subject for commitment under WIS. STAT. § 51.20(1) if the County proves by clear and convincing evidence that the person is mentally ill, a proper subject for treatment, and dangerous to himself or others. *See **Langlade County v. D.J.W.***, 2020 WI 41, ¶31, 391 Wis. 2d 231, 942 N.W.2d 277. Because Smith does not dispute that he is mentally ill and a proper subject for treatment, we focus only on the circuit court's determination he does dispute— that he is dangerous to others.

¶15    Whether the County met its burden of proving Smith is dangerous presents a mixed question of law and fact. *See **Waukesha County v. J.W.J.***, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. "[W]e will uphold a circuit

court's findings of fact unless they are clearly erroneous," ***D.J.W.***, 391 Wis. 2d 231, ¶24, and "we accept reasonable inferences from the facts," ***Winnebago County v. Christopher S.***, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (citation omitted). "[W]hether the facts satisfy the statutory standard" of dangerousness, however, is a question of law we review independently. ***D.J.W.***, 391 Wis. 2d 231, ¶¶25, 47. On appeal, Smith has the burden to show that the circuit court erred. *See* ***Gaethke v. Pozder***, 2017 WI App 38, ¶36, 376 Wis. 2d 448, 899 N.W.2d 381.

¶16 As relevant to this appeal, the County needed to establish that Smith

> [e]vidences a substantial probability of physical harm to other individuals as manifested [(1)] by evidence of recent homicidal or other violent behavior, or [(2)] by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.

WIS. STAT. § 51.20(1)(a)2.b. The County only needed to establish that the evidence satisfied either (1) or (2), not both.

¶17 The evidence showed that an unprovoked Smith began harassing Alec and did not stop despite Alec's communications to him to "back off." Smith pushed and "put his hands on" Alec, causing Alec to "push[] him off," and "kept kind of growling, making weird noises." Smith attempted to enter the home of Alec's brother and father and "definitely would have [entered] had" they not shut the door, with Alec "pretty much block[ing]" Smith.

¶18 Alex's concerns were heightened when Smith "started making gun signs with his hands," "pulling a fake trigger," causing Alec to attempt to determine if Smith had any weapons on him. With Smith aware that Alec was on the phone with the police, Smith "kept saying it was going to be a showdown or

kept saying something, and kept making these gun signs." Alec was concerned that Smith's "actions could spark off at any moment." Multiple times, Alec had to tell Smith to "keep his distance."

¶19 After calling law enforcement, Alec followed Smith to "mak[e] sure he didn't go inside of his house and go to grab a weapon as he clearly stated." Smith repeatedly stated that "it was going to be a showdown when the cops got there."

¶20 At the hospital, a restrained Smith was yelling and screaming, at times with a clenched fist, and making threats to individuals who were not present. At one point Smith "stated that he was going to use a rifle to harm [those] individual[s]."

¶21 Smith's treating psychiatrist at the mental health center testified that Smith suffers from schizophrenia and has paranoid delusions about being harassed by the police. Yet, Smith is "reluctant to come up with a plan to stay away from the police to avoid an altercation as he feels like he needs to keep doing that." Smith is unable to "put together a clear plan how to manage his paranoia safely and continues to make statements that he'll continue the behaviors that ultimately led to his detainment." The psychiatrist testified that Smith is "at definitely increased risk of harm to self [or] others as he keeps escalating trying to pursue something [related to] being harassed by the police." While in emergency detention, Smith made statements "about standoffs" and "about killing the Pope," indicating that he "has rifles" to do it. The psychiatrist again reiterated that he "can't get [Smith] to come up with a sufficient safety plan on how to manage that paranoia safely." The psychiatrist explained why Smith was a high risk for noncompliance with antipsychotic medication to control his condition.

9

Unquestionably concerning given his mental state, Smith deliberately avoided disclosing his access to firearms, yet he revealed he has a concealed carry permit and seemed to indicate he "has rifles."

¶22 In light of the totality of the evidence presented, we conclude that Smith has not demonstrated the circuit court erred in determining he is dangerous under WIS. STAT. § 51.20(1)(a)2.b. Absent involuntary commitment and medication and treatment, Smith is at high risk to not comply with antipsychotic medications that could control his dangerous condition. In this case, he approached and laid hands on a stranger, Alec, and attempted to enter into a residence he was not permitted in. Once police were called, he indicated his intent and indeed desire for a "showdown" with the police, making the threatening gesture of repeatedly pulling the trigger on a "gun." He made statements indicating a willingness to shoot at law enforcement officers and at other times made statements suggesting he had access to firearms. His statements and actions indicated a willingness to use firearms to kill.

¶23 Smith "evidence[d] a substantial probability of physical harm to other[s]." *See* WIS. STAT. § 51.20(1)(a)2.b. The County established this by showing evidence that Alec was placed in reasonable fear that Smith would engage in violent behavior and serious physical harm to at least law enforcement. Indeed, Smith's comments caused Alec to call 911, evaluate Smith's person to determine if he was currently in possession of a firearm, and follow Smith to make sure he did not go into his own residence to retrieve a firearm. Alec's concern of violent behavior and serious physical harm by Smith was objectively reasonable in light of all of Smith's words and actions.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.