**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**March 18, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2025AP2727-FT**

**STATE OF WISCONSIN**

Cir. Ct. No. 2020ME231

**IN COURT OF APPEALS**
**DISTRICT II**

IN THE MATTER OF THE MENTAL COMMITMENT OF S.R.H.

FOND DU LAC COUNTY,

PETITIONER-RESPONDENT,

V.

S.R.H.,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Fond du Lac County: DOUGLAS R. EDELSTEIN, Judge. *Affirmed*.

¶1 GROGAN, J.[1] S.R.H., hereinafter referred to as "Seth,"[2] appeals from a WIS. STAT. ch. 51 ("ch. 51") order extending his commitment and an

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

involuntary medication order entered after the July 2025 extension hearing.[3] Seth contends that Fond du Lac County failed to introduce clear and convincing evidence to support the conclusion that he is dangerous pursuant to either WIS. STAT. § 51.20(1)(a)2.b or 51.20(1)(am) and that the circuit court therefore erred in entering the Extension Order on those grounds. This court affirms.

## I. BACKGROUND

¶2      Seth has been diagnosed with schizoaffective disorder, bipolar type, has a history of alcohol and drug use disorder, and has been continuously subject to a ch. 51 commitment order since late December 2020.[4] In June 2025, the County filed a petition to extend Seth's involuntary commitment pursuant to WIS. STAT. § 51.20. In conjunction with that petition, the County also filed an examination report co-authored by Dr. Khalid Chaudhry, a licensed psychiatrist, and Brittany Kornfehl, APNP, a licensed nurse practitioner (NP), both of whom have provided psychiatric treatment for Seth. The circuit court held a hearing on

---

[2] This court uses a pseudonym to protect S.R.H.'s privacy. *See* WIS. STAT. RULE 809.86.

[3] Although the Notice of Appeal indicates that Seth appeals from both the July 10, 2025 Extension Order and Involuntary Medication Order, he does not sufficiently develop any argument challenging the validity of the Involuntary Medication Order on appeal. Accordingly, this court addresses only his challenge to the validity of the Extension Order. *See Doe 1 v. Madison Metro. Sch. Dist.*, 2022 WI 65, ¶35, 403 Wis. 2d 369, 976 N.W.2d 584 (an appellate court "'do[es] not step out of [its] neutral role to develop or construct arguments for parties'" (citation omitted)); *State v. Pettit*, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992) ("[T]he Court of Appeals of Wisconsin is a fast-paced, high-volume court" that does not "serve as both advocate and judge."); *Gaethke v. Pozder*, 2017 WI App 38, ¶21, 376 Wis. 2d 448, 899 N.W.2d 381 (appellate courts need not address undeveloped arguments).

[4] Seth stipulated to the extension in 2024. Having reviewed the Record, it appears Seth's mental health struggles predate the initial December 2020 commitment.

the petition in July 2025. The County called two witnesses, Dr. Chaudhry and NP Kornfehl, and Seth also testified on his own behalf.

¶3 At the hearing, Dr. Chaudhry testified he has been a licensed psychiatrist since 2003, he obtained his Wisconsin license in 2016, and although he was not currently "following" Seth as an outpatient at the time of the extension hearing, he has been one of Seth's treating psychiatrists, both inpatient and outpatient, "for a long time off and on." Dr. Chaudhry had most recently seen Seth within the month prior to the hearing; however, Seth had refused to talk with him, called him names, and was "paranoid and defensive, using condescending and derogatory remarks[,]" which Dr. Chaudhry described as Seth's "baseline" as to how he acts "with almost … everybody." When asked if he had formed an opinion as to Seth's "mental condition" over the course of having treated him, Dr. Chaudhry explained that Seth "suffer[ed] from [a] longstanding history of schizoaffective disorder, schizophrenia, and [that he] has been hospitalized psychiatrically multiple times." He also confirmed that Seth has a "history of alcohol and drug use disorder[.]"

¶4 In regard to Seth's schizoaffective disorder, Dr. Chaudhry explained that Seth "continues to present with … intermittent episodes of significant residual sign[s] and symptom[s] of psychotic behavior," that there is paranoia, and that Seth is "grandiose with poor or no insight into his mental illness[] and the need to continue to take the medication." When asked, Dr. Chaudhry confirmed that schizoaffective disorder is a substantial disorder of Seth's perception and mood, as well as that schizoaffective disorder "grossly impairs [Seth's] judgment, behavior, [and] capacity to recognize reality[.]" As to whether or not Seth "poses a danger to himself or others[,]" Dr. Chaudhry opined that Seth is dangerous because "if he is not treated, he is not monitored, he becomes very provocative, paranoid,

defensive, abusive, provoking other people for no reason, and accusing them, and cursing them around, and he becomes very condescending, a very filthy mouth."

¶5 Dr. Chaudhry also testified as to Seth's multiple hospitalizations, confirming: (1) Seth has been admitted to the "acute unit" around a dozen times; (2) he has seen Seth exhibit "very psychotic behavior" and Seth presents that way "when he is not adequately treated or decompensated"; and (3) Seth is a proper subject for treatment with outpatient treatment being the least restrictive to meet his treatment needs. He further confirmed Seth requires medication, discussed specific medications Seth has been prescribed, such as Depakote, "a big, high-potency mood stabilizer[,]" Invega Sustenna, an injected antipsychotic medication, and clozapine, another strong antipsychotic medication "use[d] in very difficult, resistant, refractory patients."

¶6 Dr. Chaudhry also described Seth as "becom[ing] more manageable and tractable when he is on the medication" and explained that when Seth is medicated, "he is not as grossly impaired" and the various medications helped with "aggression, agitation, hostility, and confrontational behavior, … poor impulsive control behaviors" and "paranoia and suspiciousness and grandiosity, all those psychotic symptoms." Dr. Chaudry further confirmed: (1) he had discussed these medications with Seth, although "not recently since [Seth] declined to talk to" him; (2) the doctor did not believe Seth was capable of understanding the advantages and disadvantages of these medications; (3) Seth had a history of medication noncompliance, which he described as a "chronic nonadherence history"; and (4) the doctor did not believe Seth was competent to refuse medication. Based on his experience, Dr. Chaudhry believed Seth continued to require commitment and treatment to address his mental illness.

¶7    On cross-examination, Seth's counsel questioned Dr. Chaudhry as to the side effects of the prescribed medications.  He explained that certain medications, such as clozapine, can affect white blood cell counts and it is therefore important to consistently monitor a patient's blood levels, and he also explained that the long-term effects of clozapine, which Seth had been on since February 2025, could include excessive drooling and myocarditis, a heart condition.

¶8    Prior to NP Kornfehl's testimony, which followed Dr. Chaudhry's, the County moved the aforementioned co-authored examination report into evidence.  Seth objected on the basis that the report contained hearsay statements from multiple individuals, including other treatment providers and police officers.  Referencing WIS. STAT. § 907.02, the circuit court overruled Seth's "objection to the extent that this is a report of an expert" and explained it would not "accept[] the [hearsay] statements as true."

¶9    Like Dr. Chaudhry, NP Kornfehl, who has been a nurse since 2008 and a psychiatric nurse practitioner since 2018, testified she has worked with Seth, sees him approximately every three months, and had most recently seen him in May 2025—approximately two months prior to the hearing.  NP Kornfehl further confirmed she had personally observed Seth exhibiting "psychotic symptoms" and had seen Seth during his hospitalization in February 2025.

¶10    NP Kornfehl reviewed Seth's treatment records prior to the hearing, and she confirmed her opinion that Seth suffers from schizoaffective disorder, bipolar type.  In describing schizoaffective disorder, bipolar type, she explained it "is a combination of schizophrenia and a mood disorder, such as depression or bipolar[,]" and the symptoms Seth exhibits include "[d]elusional thinking,

hallucinations, manic episodes, [and] impaired reality." When asked "whether or not schizoaffective disorder is a substantial disorder of [Seth's] thought, mood, or perception[,]" NP Kornfehl responded in the affirmative and confirmed that schizoaffective disorder "grossly impair[s] [Seth's] judgment, behavior, or capacity to recognize reality[.]"

¶11     After NP Kornfehl described Seth's diagnosis, the County questioned her as to whether she believes Seth "poses a danger to himself or others[.]" She testified Seth poses such a danger "without medication and continued treatment[,]" and her opinion was based at least partly on his most recent hospitalization in February 2025. Specifically, she explained:

> [d]uring [Seth's] most recent inpatient hospitalization, he was noticed to be agitated with the prescriber, yelling and screaming in his face. Also made several phone calls during his hospitalization, at one point talking about pile-driving a female's face into the concrete, thought [sic] it was unclear who he was referring to. It's understood that as a result of those calls he has new criminal charges.

NP Kornfehl then went on to explain Seth's history of making threatening comments:

> He has also made comments in the past about skinning his previous psychiatrist, and called a previous inpatient prescriber a pedophile and stated that he was going to sacrifice them to the devil, and left voicemails to various parties talking about sending a bullet with the county's name on it, and has had several criminal charges in [the] past … while psychiatrically unstable, to include battery, resisting or obstructing, and disorderly conduct.

Based on this, NP Kornfehl opined Seth is a suitable candidate for treatment and recommended outpatient treatment, "with continued medication management[,]" as the least restrictive setting that would be consistent with Seth's treatment needs.

¶12 NP Kornfehl also addressed Seth's prescribed medications, and consistent with Dr. Chaudhry's opinion, she did not believe those medications would impact Seth's ability to participate in the hearing. She also confirmed: (1) she had addressed "the advantages and disadvantages of taking the prescribed medications and treatment with" Seth; (2) Seth did not appear to have any insight as to his need for medication because he did not believe he needs medication; and (3) "he describes his medications as -- as poison and stated multiple times that he would not continue to take the medications if not under commitment." NP Kornfehl believed Seth's medications were helping because he had continued to comply with taking the medications while being medicated, and he had likewise been able to successfully remain in the community following discharge from his prior hospitalization in February 2025. She further opined Seth would decompensate if not medicated, which had occurred in the past, and she also did not believe Seth was competent to refuse medication.

¶13 On cross-examination, Seth's attorney questioned NP Kornfehl about Seth's prescribed medications, how those medications were monitored, and the possible side effects. She explained they monitored Seth's medications via bloodwork, dosage changes could be considered every few months when she saw Seth, and changes could also be made at other times if he reported having experienced side effects. When asked if Seth had expressed any concerns about his medications or side effects, she said he had not done so recently but he had done so in the past and that in regard to reported side effects, she had adjusted dosages and added other medications to combat side effects when necessary.

¶14 Seth testified on his own behalf. He informed the circuit court he would prefer to see different health care providers, he has "created a support network[,]" and he was experiencing side effects on his current medications.

When asked about his preference to see a healthcare provider at SSM Health rather than the providers he was currently seeing, Seth expressed he had "tried to go there but" he could not do so due to the ch. 51 commitment, he felt "like … a slave to the state of Wisconsin[] [because] they're making me do things that I shouldn't have to do[,]" suggested his current providers were medicating him to "mak[e] money," and he was "a lab rat[.]" Seth further indicated he had contacted NP Kornfehl in regard to his side effects but asserted the side effects had not been adequately addressed.

¶15    Seth's counsel also asked him whether he believed the prescribed medication was "working well for him[,]" to which he stated he did not "believe [any] of the medications are beneficial … because [he does not] suffer from a mental illness." Finally, in response to the providers' testimony that he had made a comment about "pile-driving" someone, Seth testified he did not recall having made such a comment, and he further testified that comments he may have made regarding bullets were in reference to "a song on the radio," he did not "know what they're trying to say that I'm trying to do[,]" he "believe[s] Dr. Chaudhry is racist[,]" and he (Seth) "do[es]n't threaten people" and had no intention of hurting anyone.

¶16    Following the witnesses' testimony, the parties made final arguments to the circuit court. The County argued an extension order was appropriate based on the petition, testimony, and examination report, and it specifically asked the court to find that Seth "suffers from a major mental illness, that being schizoaffective disorder[,]" and for it to also "find that he's a danger primarily to others based on recent evidence, his most recent hospitalization, and that others were placed potentially in fear of his behavior based on his own comments and criminal charges that were initially filed as a result of that." The

County also argued that "based on [Seth's] treatment record, there is a substantial likelihood that he would be a proper subject for commitment if treatment were withdrawn." Seth, to the contrary, "dispute[d] that he has a mental illness or that he's a proper subject for treatment[,]" and he also argued that the County had failed to establish dangerousness because although "people can not like what" Seth says, he was "not physically harming anyone" and "indicat[ed] that the statements he made were statements from a song or something that wasn't a direct threat to anybody[.]" He also argued, in the alternative, for a six-month extension so as to provide for "a more prompt review" in light of his concerns regarding side effects, and he also objected to a continuation of the involuntary medication order.

¶17    The circuit court granted the County's request for an extension of the commitment and involuntary medication orders. In reaching this conclusion, the court noted Seth's history of AODA[5] and mental health needs and specifically referenced the providers' testimony regarding Seth's diagnosis of schizoaffective disorder, his behavior, his conduct, and his lack of insight into his mental illness. The court also noted: (1) Seth's "history of noncompliance of medications" was "concerning"; (2) the testimony showed Seth was not competent to refuse medication; and (3) NP Kornfehl had testified that during her May 2025 interview with Seth, he had exhibited "delusional thinking, manic episodes, [and] impaired reality with psychotic symptoms."

---

[5] This is an acronym for Alcohol and Other Drug Abuse.

9

¶18    In reference to WIS. STAT. § 51.20's requirements for the extension of a mental commitment order,[6] the circuit court stated:

> You were recently hospitalized in January and February and there has been a demonstration of substantial disorder of thought, mood, and perception that grossly impairs the ability to recognize reality. Without treatment and prescriptions, there is a danger to yourself or others. There has been some description of being agitated, comments about pile-driving a female's face, comments made to sacrifice someone to the devil. There is a description of sending a bullet. There are new events of battery, resisting, obstructing, disorderly conduct.[7] By its very nature, battery is a violent offense causing injury, pain, or suffering to an individual, and that would be a manifestation of the risk to others.
>
> ….
>
> Your testimony, [Seth] -- [the County's attorney] made a meaningful point with limited questions on cross-examination. On direct, you stated, "I don't believe any medications are beneficial for me because I don't suffer from a mental illness." [Seth], if you're being honest with yourself, you know that there are some aspects of your mental health that need to be managed. That has been present for a long time. That doesn't just go away.

The court found: (1) Seth "is mentally ill"; (2) "there is a substantial probably of physical harm to others -- that is manifested by recent overt actions or threats -- that there is a substantial likelihood based upon his treatment that he'd be a proper

---

[6] At no point during the hearing did any party, including the circuit court, specifically reference WIS. STAT. § 51.20 at all. Although the references made during the course of the hearing clearly relate to § 51.20(1)(a)2.b and § 51.20(1)(am), the parties and court are reminded of the importance of specifically referencing the specific statute to assist appellate courts on review. *See* ***Langlade County v. D.J.W.***, 2020 WI 41, ¶3, 391 Wis. 2d 231, 942 N.W.2d 277 ("circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2 on which the recommitment is based").

[7] It appears that the circuit court misspoke in referencing "new events of battery"; however, the court's findings and conclusions of law were not based solely on that point.

subject for treatment"; and (3) "if [treatment] were withdrawn," Seth would pose "a substantial probability of physical harm to others." Accordingly, the court entered a written order extending Seth's commitment for twelve months. Seth appeals.

## II. STANDARD OF REVIEW

¶19 In a ch. 51 recommitment hearing, the County has the burden to establish by clear and convincing evidence the necessary elements required for commitment, i.e., that the individual is mentally ill, a proper subject for treatment, and dangerous. *See Langlade County v. D.J.W.*, 2020 WI 41, ¶29, 391 Wis. 2d 231, 942 N.W.2d 277; WIS. STAT. § 51.20(1)(a)1-2, (13)(e), 13(g)3. If the circuit court determines that the County carried its burden, the court must "make specific factual findings with reference to the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. on which the recommitment is based." *See D.J.W.*, 391 Wis. 2d 231, ¶3.

¶20 This court's review of a recommitment order "presents a mixed question of law and fact." *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. Appellate courts will "uphold a circuit court's findings of fact unless they are clearly erroneous[,]" *id.*, and will "'accept reasonable inferences from the facts[.]'" *Winnebago County v. Christopher S.*, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (citation omitted). Whether facts satisfy the statutory standards, however, is a question of law this court reviews de novo. *Marathon County v. D.K.*, 2020 WI 8, ¶18, 390 Wis. 2d 50, 937 N.W.2d 901.

## III. DISCUSSION

¶21    The sole issue presented on appeal is whether clear and convincing evidence in the Record supports the circuit court's factual findings upon which it concluded Seth is dangerous and thereby warranting extension of his commitment.[8]

¶22    Seth contends the County failed to establish by clear and convincing evidence that he presented a danger to others under WIS. STAT. § 51.20(1)(a)2.b. First, he says, there was no evidence of recent homicidal or other violent behavior, but rather that NP Kornfehl testified only that he had been charged with "battery, resisting or obstructing, disorderly conduct" "in [the] past[.]"  Thus, he argues, the circuit court's statement that "[t]here are *new* events of battery, resisting, obstructing, [and] disorderly conduct"—and its concomitant reliance on that belief—was clearly erroneous.  (Emphasis added.)    He also contends NP Kornfehl's testimony that he had made comments about "pile-driving a woman[,]" "comments made to sacrifice someone to the devil[,]" and "a description of sending a bullet" was hearsay, and the court erred in relying on them because it had previously indicated it would not consider those statements as true.  He says these comments, even if otherwise admissible, did not constitute "'threats' to do 'serious physical harm' that would place others 'in reasonable fear of serious harm'" for the purpose of § 51.20(1)(a)2.b because it was unclear as to whom he may have been talking to when these purported statements were made, the context in which they arose, "or whether he had ever threatened or harmed that

---

[8] Although Seth argued to the circuit court he does not suffer from a mental illness, he does not develop any argument on appeal challenging the court's conclusion that he is mentally ill.

person in the past." At most, he says, the County established his comments were "strong expressions of negative emotion." Seth also asserts that because these alleged statements do not prove dangerousness within the meaning of § 51.20(1)(a)2.b, the County likewise failed to establish dangerousness under § 51.20(1)(am), which requires a link to one of the § 51.20(1)(a)2 standards.

¶23 The County, to the contrary, asserts Dr. Chaudhry's and NP Kornfehl's testimony, combined with their co-authored examination report, sufficiently establishes "that Seth would become the proper subject for commitment if treatment were withdrawn because there was a substantial likelihood that he would become dangerous under the second standard." It says the evidence presented, which included evidence of both "*recent and past* verbal threats to torture, shoot and kill[,]" established that Seth has a "long history of dangerous behavior and regular medication noncompliance that resulted in decompensation" and multiple hospitalizations. The County also pointed to testimony regarding incidents that occurred during Seth's February 2025 hospitalization and events that occurred while Seth was under prior orders, specifically noting that "[m]any of the violent threats" referenced killing and "vicious harm to others[.]"

¶24 The County also points to CCAP records reflecting the State charged Seth in March 2025, with violating WIS. STAT. § 940.204(2) (Bodily Harm or

Threat to Employee of Health Care Facility or Family as a repeater),[9] and the circuit court made "reasonable inferences in [its] factual findings regarding pending criminal charges for battery mentioned during [NP Kornfehl's] testimony." The County further asserts this court can and should also review transcripts from prior hearings, which it says further support the circuit court's findings, because this court is to review the Record as a whole. *See **Becker v. Zoschke***, 76 Wis. 2d 336, 347, 251 N.W.2d 431 (1977).

¶25 WISCONSIN STAT. § 51.20 governs ch. 51 recommitment proceedings. To involuntarily commit an individual, a county must establish by clear and convincing evidence the individual is mentally ill, a proper subject for treatment, and dangerous. Sec. 51.20(1)(a)1-2, 13(e), 13(g)3; ***J.W.J.***, 375 Wis. 2d 542, ¶18. "To prevail in a recommitment proceeding, the petitioner must demonstrate the same three elements necessary for the initial commitment." ***Sheboygan County v. M.W.***, 2022 WI 40, ¶18, 402 Wis. 2d 1, 974 N.W.2d 733; § 51.20(1)(a)2.b. Dangerousness under § 51.20(1)(a)2.b may be established through either: (1) evidence there is "a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent

---

[9] While NP Kornfehl generally referenced these charges during her testimony, it is not clear from the Record whether the circuit court had reviewed the CCAP records or knew what specific charges the State had alleged. It is also not clear whether the court was aware of the specific allegations raised in that case, as there is no reference to the criminal complaint in the extension hearing transcript and the complaint itself does not appear in the Record. Although the County's appellate brief identifies the case numbers in which the State filed these charges, this court does not identify those case numbers herein as doing so would reveal Seth's identity.

"CCAP" is the acronym commonly used to refer to the Consolidated Court Automation Program, which "is a case management system provided by [the] Wisconsin Circuit Court Access program" that "provides public access online to reports of activity in Wisconsin circuit courts[.]" ***State v. Bonds***, 2006 WI 83, ¶6, 292 Wis. 2d 344, 717 N.W.2d 133. Appellate courts may take judicial notice of CCAP records. *See* WIS. STAT. § 902.01; *see also **State v. Aderemi***, 2023 WI App 8, ¶7 n.3, 406 Wis. 2d 132, 986 N.W.2d 306.

behavior"; or (2) "evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm." Sec. 51.20(1)(a)2.b.

¶26 "'WIS[CONSIN] STAT. § 51.20(1)(am) provides a different avenue for proving dangerousness if the individual has been the subject of'" a commitment immediately prior to the recommitment petition. *M.W.*, 402 Wis. 2d 1, ¶19 (quoting *Portage County v. J.W.K.*, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509). Pursuant to § 51.20(1)(am), dangerousness "'may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn.'" *M.W.*, 402 Wis. 2d 1, ¶20 (quoting § 51.20(1)(am)). This method of proving dangerousness is necessary because "'an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur.'" *M.W.*, 402 Wis. 2d 1, ¶20 (quoting *J.W.K.*, 386 Wis. 2d 672, ¶19). If a county relies on § 51.20(1)(am) to prove dangerousness, a link to one of the five dangerousness standards from § 51.20(1)(a)2 is required. *D.J.W.*, 391 Wis. 2d 231, ¶59.

¶27 On appeal, Seth argues only that the County failed to establish dangerousness by clear and convincing evidence, and he argues that the County failed to do so under both WIS. STAT. § 51.20(1)(a)2.b ("recent overt act, attempt or threat to do serious physical harm") and § 51.20(1)(am) ("substantial likelihood, based on … treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn"). He disputes neither the circuit court's finding that he is mentally ill nor its finding that he is otherwise a

15

proper subject for commitment, and this court therefore need not address those elements.

¶28    At the outset, this court notes the circuit court did not explicitly reference WIS. STAT. § 51.20(1) during the extension hearing; however, it is clear from the hearing transcript and the written Extension Order entered following the hearing that it determined the County had carried its burden of establishing dangerousness under both § 51.20(1)(a)2.b and § 51.20(1)(am).  Specifically, on the Extension Order, the court checked the boxes indicating Seth is dangerous because there is "a substantial probability of physical harm to other individuals under § 51.20(1)(a)2.b." "[a]s manifested or shown by" "a recent overt act, attempt or threat to act under § 51.20(1)(a)2.a or b." *and* because there is "a substantial likelihood, based on [his] treatment record, that [Seth] would be a proper subject for commitment [under § 51.20(1)(a)2.b] if treatment were withdrawn[.]"  Having reviewed the Record, this court is satisfied the County presented clear and convincing evidence sufficient to support the circuit court's conclusion that Seth is dangerous within the meaning of § 51.20(1)(a)2.b, and therefore the analysis in this opinion addresses only that standard, as dangerousness only needs to be established under one standard.

¶29    At the extension hearing, NP Kornfehl testified that during Seth's most recent hospitalization in February 2025, he "made several phone calls … at one point talking about pile-driving a female's face into the concrete[.]"  She also testified about the State's criminal charges against Seth stemming from his comments during the hospitalization.  While "it was unclear who [Seth] was referring to" in regard to the comments, such comments could reasonably cause a person, particularly those who are aware of his history of mental illness and prior behavior and threatening statements, to be placed in fear for the person's safety.

16

*See* **R.J. v. Winnebago County**, 146 Wis. 2d 516, 522-23, 431 N.W.2d 708 (Ct. App. 1988) (WIS. STAT. § 51.20(1)(a)2.b is satisfied so long as "others are placed in a fearsome position by a disturbed person's actions even if the person placed in that position has no subjective awareness of it."). Comments about "pile-driving" someone's face into concrete certainly qualify as a threat to do harm, and the circuit court clearly considered and ultimately relied upon this threatening statement in reaching its conclusion that extending Seth's commitment was appropriate under § 51.20(1)(a)2.b.[10]

¶30 Although Seth challenges the circuit court's reliance on that testimony on the basis it was hearsay, the County correctly asserts Seth forfeited that argument based on his failure to object to the testimony during the extension hearing. *See* **State v. Agnello**, 226 Wis. 2d 164, 173, 593 N.W.2d 427 (1999) (objections must be stated with specificity "so that both parties and courts have notice of the disputed issues as well as a fair opportunity to prepare and address them"). Seth's only response to this argument in his Reply brief is that he objected to hearsay statements contained within the examination report—an objection that occurred during Dr. Chaudhry's testimony—and the court confirmed it would not rely on those hearsay statements for the truth of the matter asserted. However, that objection, and the court's subsequent clarification that it would not rely on those hearsay statements, pertained *only* to the hearsay statements contained within the report—it did *not* extend to NP Kornfehl's live testimony later in the hearing—and Seth therefore failed to preserve any hearsay

---

[10] Seth's argument that the circuit court did not make a finding that this statement was a threat is a non-starter, as we generally do not require courts to utter "magic words." *See, e.g.*, **State v. B.W.**, 2024 WI 28, ¶78, 412 Wis. 2d 364, 8 N.W.3d 22 (stating that magic word requirements are strongly disfavored).

challenge to her testimony about incidents that occurred or statements he made during his most recent hospitalization. *See **Bennett v. State***, 54 Wis. 2d 727, 735, 196 N.W.2d 704 (1972) ("An objection must be made to the introduction of evidence as soon as the adversary party is aware of the objectionable nature of the testimony. Failure to object results in a [forfeiture] of any contest to that evidence.") The court therefore did not err in relying on NP Kornfehl's testimony. If Seth had made a contemporaneous objection to NP Kornfehl's testimony, the County would have had the opportunity to show this evidence was not hearsay or that a hearsay exception applied. It could have called the providers who were present when Seth made the threats during his recent hospitalization or it could have called the recipients of the threatening phone calls to testify.

¶31 The criminal charges NP Kornfehl also referenced during her testimony, which the circuit court subsequently cited in its oral ruling—therefore indicating it had taken judicial notice of the criminal matter—further support the conclusion that Seth had recently "threat[ened] to do serious physical harm" that would place others in reasonable fear of safety. *See* WIS. STAT. § 51.20(1)(a)2.b. The criminal complaint, filed in March 2025,[11] was not presented to the circuit court at the hearing; however, the County included a certified copy of that complaint in the appendix filed in conjunction with its appellate brief, and as the County requests, this court may take judicial notice of it, as courts may take

---

[11] The CCAP records reflect that the March 2025 complaint was dismissed on Seth's motion in June 2025—a few weeks prior to the extension hearing—and it does not appear from the Record that the circuit court was made aware of that dismissal. Likewise, it is unclear whether NP Kornfehl or the County's attorney at the extension hearing were aware of the dismissal, either. However, Seth did not object to the testimony, as discussed, and he also does not dispute that the charges were filed. And, importantly, the "beyond a reasonable doubt" standard applicable to criminal charges does not apply at an extension hearing, which requires only clear and convincing evidence.

judicial notice of "[a] fact capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *See* WIS. STAT. § 902.01(2)(b). This court concludes it is appropriate to do so here.[12] However, it does so only to the extent the allegations set forth therein provide *additional* support for NP Kornfehl's testimony regarding statements Seth made during his hospitalization and her reference to the State having filed criminal charges stemming from the statements made during that time. This court does not rely on those allegations as a sole basis for concluding the circuit court's findings were not clearly erroneous.

¶32 The March 2025 complaint charged Seth with multiple counts of disorderly conduct and felony bail jumping along with one charge of "threat of bodily harm to a worker in a health care facility" contrary to WIS. STAT. § 940.204(2), all as a repeater.[13] The complaint then describes various messages Seth purportedly left, including a message to a city attorney "to the effect of slaughtering police officers from the Ripon Police Department" and messages to others about people burning in hell. Additionally, the complaint referenced a police report regarding a staff member at a local hospital having received a phone call from Seth wherein Seth "got upset and made threatening comments" such as "'I'm going to come murder you, you bitch[,]'" which the recipient purportedly

---

[12] While Seth disputes the County's suggestion that this Court can take judicial notice of the facts set forth in the complaint, he *does not* dispute the validity of the certified copies of these criminal complaints; rather, he argues only that these documents were not before the circuit court and this court therefore cannot "take judicial notice of the factual allegations in the criminal complaint" because this court "cannot make factual findings that the circuit court did not make based on allegations in court documents." *See Sands v. Menard, Inc.*, 2013 WI App 47, ¶32 n.14, 347 Wis. 2d 446, 831 N.W.2d 805.

[13] As of August 9, 2025, the relevant portions of WIS. STAT. § 940.204(2) regarding threats to a healthcare worker are now found at WIS. STAT. § 947.016(3). *See* 2025 Wis. Act. 24.

described as having caused her to feel "concerned and worried for her safety[.]" Not only do these allegations support NP Kornfehl's testimony that Seth made threatening phone calls during his February 2025 hospitalization—they also support the circuit court's conclusion that these statements qualified as "overt act[s] … or threat[s]" which placed others "in reasonable fear of violent behavior and serious physical harm," and Seth was therefore dangerous within the meaning of WIS. STAT. § 51.20(1)(a)2.b. *See id.*

¶33 Based on the totality of the evidence presented, this court is satisfied the circuit court's findings, which it clearly tied to the testimony presented at the extension hearing, were not clearly erroneous and accordingly, it did not err in concluding that Seth is dangerous within the meaning of WIS. STAT. § 51.20(1)(a)2.b. Having reached this conclusion, it is unnecessary to determine whether the circuit court erred in also concluding the County had established dangerousness under § 51.20(1)(am). *See, e.g.*, **State v. Lickes**, 2021 WI 60, ¶33 n.10, 397 Wis. 2d 586, 960 N.W.2d 855 ("Issues that are not dispositive need not be addressed." (quoted source omitted)); **Martinez v. Rullman**, 2023 WI App 30, ¶5, 408 Wis. 2d 503, 992 N.W.2d 853 (this court decides cases on the narrowest possible grounds).

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.